7 A.3d 665

Malcolm J. MARKS

v.

CRIMINAL INJURIES COMPENSATION BOARD.

No. 0921, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Oct. 29, 2010.

38

40

Russell P. Butler (Lauren B. Tabackman, MD Crime Victims' Resource Center, Inc., on the brief), Upper Marlboro, MD, for appellant.

Steven G. Hildenbrand (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: MEREDITH, GRAEFF and RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

RAYMOND G. THIEME, JR., J. (Retired, Specially Assigned).

This is a petition for judicial review by Malcolm J. Marks, appellant,[1] from the decision by the Circuit Court for Baltimore City affirming the denial of victim's compensation benefits issued by the Criminal Injuries Compensation Board. Although appellant presents a variety of questions for our consideration, at issue is whether the Board's decision is supported by substantial evidence based on the record as a whole, is not arbitrary and capricious, and whether it accords with applicable law.[2]

For the reasons set forth below, we shall affirm.

---

**1.** We employ the term "appellant" for convenience.

**2.** Appellant presents the following specific issues:

## PROCEDURAL AND FACTUAL BACKGROUND

This matter involves a claim by Malcolm Marks for victim's benefits under the Maryland Criminal Injuries Compensation Act ("Act"). Md.Code (2001 & 2008 Repl.Vol.), §§ 11–801 *et seq.* of the Criminal Procedure Article ("Crim.Proc.").[3]

### Procedural History

On September 17, 2006, appellant was in Northeast Baltimore checking on his mother's property in the 1100 block of East 20th Street. At about 2:00 a.m., while he was leaving the unoccupied house, appellant was shot several times by Corey

---

I. Review of errors of law is de novo.
II. Contributory conduct must have actually caused the victim's injuries in order to the Board to deny a claim.
III. The Board's obtaining and using criminal history information constituted an unlawful procedure as it violated federal and state law.
IV. The Board cannot create a non-statutory reason for denying a claim.

Appellant then states two "Questions Presented" as follows:

1. Did the Circuit Court err in upholding the Board's denial of Victim's claim for compensation on the basis that the Victim's own conduct contributed to his injuries?
2. Did the Board's obtaining and using the Victim's criminal history record information constitute an unlawful practice that may have prejudiced the Victim?

In a reply brief, appellant asserts:

I. Appellee's Brief was filed untimely and should be stricken, and Appellee should not be allowed to present oral argument.
II. Appellee failed to address the error of law raised by Mr. Marks that the law requires a nexus exists between the claimant's behavior and his injuries in finding contributory conduct.
III. This Court can and should review the issue of the Board's improper use of Criminal Justice Information System records in denying Mr. Marks' claim.
IV. Denying compensation to Mr. Marks based on the reasons given by the Board is contrary to the intent of the General Assembly in enacting the Criminal Injuries Compensation Act.

**3.** Originally codified at Md.Code (1968 Supp.), Art. 26A, §§ 1–17, the Criminal Injuries Compensation Act was transferred without substantive change to Md.Code (1996 Repl.Vol.), Art. 27, §§ 815–32, *see* 1996 Laws of Maryland, Chap. 585, and in 2001 was recodified and placed in the Criminal Procedure Article. Md.Code (2001 & 2008 Repl.Vol.), §§ 11–801–11–819 of the Criminal Procedure Article. *See* 2001 Laws of Maryland, Chap. 10.

Harrison. Appellant claimed that the assailant approached him and demanded money. Appellant suffered grievous injuries as a result and was hospitalized. He continues to experience the effects of the assault, claiming that his injuries require physical therapy.

On December 17, 2006, appellant filed a claim for victim's benefits with the Criminal Injuries Compensation Board ("Board"). On June 5, and June 26, 2007, the Board issued a "Tentative Decision" denying benefits. The decision was affirmed on July 12, 2007, by the Secretary, Department of Public Safety and Correctional Services ("Secretary").

Appellant filed a petition for judicial review in the Circuit Court for Baltimore City. A hearing was conducted on February 5, 2008, after which the circuit court issued an Order vacating the Board's decision and remanding for further proceedings. The circuit court directed the Board to "determine whether there exists enough credible and probative evidence to generate the issue that [appellant] engaged in conduct that contributed to the injuries he sustained on the occasion at issue." The circuit court added that, should the Board "conclude that this issue has been generated, the Board must afford Petitioner a full and fair opportunity at a hearing to prove that he did not contribute to the infliction of his injuries."

This hearing was conducted on September 24, 2008, and the Board issued a tentative decision on October 24 denying the claim. This denial was affirmed by the Secretary on November 17, 2008. Appellant again sought judicial review of the Board's decision, and on June 12, 2009, the circuit court upheld the Board's decision. This petition for judicial review followed.

### Facts

Appellant testified at the hearing on behalf of his claim, and he also presented the supporting testimony of Karen Marks, Lemuel Watson, and Anthony Ivory. The Board's witnesses

were Detective Frank Miller and Board Investigator Anita McKoy.

Appellant recounted that he would visit the neighborhood about two or three times per month to look after his mother's house. Because his mother mainly resides in New York, appellant would check on her property to "secure the dwelling," meet with the occasional tenant, and collect rent. On September 17, 2006, at about 9:00 or 10:00 p.m., appellant was at the house to "make sure all the doors were locked . . . [and] all the windows were down." After going through the house, appellant was preparing to leave. He recounted what next occurred:

As I went to the front door, I opened the door, she has a security screen door. I locked the front door. And as I was securing the security gate and locking the security gate, it was kind of odd because everybody was yelling. So as I turn around, I see a guy coming across the street. [He] was black, had a red mask on.

\* \* \*

At that point when he was coming closer to me, I didn't recognize him at that time.

Okay. As he approached me, I acted like I was trying to get back in the house. He says, "Do you know what time it is? Lay down, get on the ground."

So I turned around and looked at him, and I told him, "I'm not getting on the ground."

At that time, I lunged off the step but he had a gun. He had a gun in his hand. At that time I lunged up the step. And as I came down off the step, he was on the sidewalk, he shot me in my chin. And me collapsing on him, I grabbed him in a bear hug and secured the gun under my left, left arm. And as I proceeded to slam him on the ground, he— we both fall to the ground. I gets up. I runs up the steps to try to get back in the house because he had already shot me in the face. He shoots me in the buttocks.

And then I turned back around because I can't get in the house at this time. I grabs his armpits and we were

tussling the whole time. The whole time we're tussling[.] . . . He kept shooting just rapidly.

As we were tussling, I pulls the mask that he had, the bandanna that he had on his face completely off, and, like, I sees him. I said—so he keeps on shooting.

* * *

When I took the mask off, I said, I recognized his face.

The assailant finished shooting and ran off, while appellant returned to the house and "laid on the bed because I was in shock that I got shot." A neighbor arrived and appellant was eventually hospitalized.[4]

Appellant had recognized his assailant after he pulled off the mask, and recalled that his name was Corey Harrison. Appellant had known Harrison "through the neighborhood," and cited an incident in the past involving dirt bikes:

I used to drive—I used to have dirt bikes in my mother's yard. That's my mother's home. And I used to take the kids out Sunday, little kids in the neighborhood on Sunday and take them dirt bike riding.

And one particular incident, the dirt bike come up missing. They broke in the yard and took the dirt bikes. And he said that he did—his name—they called him Seed or something, Corey Harrison.

Appellant denied having any other dealings with Harrison, and had not spoken with him in months. He insisted that there was no "drug dispute with Corey Harrison[:]"

[APPELLANT'S COUNSEL]:

Q So I just want to get this straight. So you're telling us there was no drug dispute with Corey Harrison, the man who shot you?

A Absolutely not.

Q Nothing related to him at all?

A Absolutely not.

---

4. The nature of appellant's injuries is not at issue in this case.

Q Okay. You had just seen him with the dirt bikes and you had seen him around, but there was no dispute over territory?

A Absolutely not. Absolutely not.

The Board then examined Investigator Anita McKoy. McKoy interviewed appellant, and also accessed appellant's records in the Criminal Justice Information System. She testified without objection:

> As part of my investigation, I had went to Criminal Justice Information System. On Mr. Marks' application he had listed that he was robbed and shot and he had listed the offender of Corey Harrison, so I did a CJIS check on both individuals. . . . Mr. Marks was also listed on CJIS as a drug kingpin and there were multiple distribution charges of handgun and selling around school.

> Also, a look at Mr. Harrison's record, he was known to sell in the area, the vicinity where the shooting of the victim, took place.

> A review of the police report indicates the incident as a[n] assault, but according to Mr. Marks' application in his brief description said, "I was robbed and shot." And also in my interview with him, he said he had over $1,000 in his wallet. So I think that would have been pertinent information to pass on to the police.

* * *

[COMMISSIONER ROBERTS:] The designation of drug kingpin, where did that come from?

A That came from Harford County. I think it was in 1993. He was convicted . . . 1/15/93, Harford County, CDS. It was listed as—charged with drug kingpin and distribution, et cetera, firearm. And transporting a deadly weapon.

Appellant's counsel argued that these records were not accurate:

[APPELLANT'S COUNSEL]: If I may interrupt. Can I—I want Mr. Marks to talk about his criminal history,

because he doesn't have multiple convictions. That's not correct.

After the Board assured counsel that she could examine appellant about the accuracy of his records, the examination returned to the investigator. McKoy then elaborated on discussions with a detective that underscored her suspicions:

On 3/30/07 I had a telephone interview with Detective Miller, and Detective Miller had conveyed that Corey—just want to back up for a minute. Malcolm Marks was shot on 9/17/06 and Corey Harrison was shot six days later, 9/23/06, and he was shot and killed.

The conversation with Detective Miller advised us that this was over drug territory, territory [in] the area of Robb Street and 20th Street.

\*　　\*　　\*

And that Malcolm Marks has the majority of the neighborhood, most of the territory, and Corey Harrison had a smaller part of that area.

Appellant was examined further by his attorney about his criminal record:

Q You were, as you told me, . . . had a drug-related conviction, so just tell us about that.

A 1993 I had a drug conviction.

\*　　\*　　\*

Distribution of CDS. The kingpin charge was dropped, and it was dropped. They charged me with a kingpin charge and they dropped it. They ended up giving me distribution with intent in '9[3].

\*　　\*　　\*

Wearing and carry[ing] a handgun, that was all in the same case. . . .

\*　　\*　　\*

1999, I got locked up also for simple possession. I got a simple possession charge.

Appellant was also asked about the $1,000 that had been in his possession on the night of the shooting. He explained that he always has cash on hand and that he was working for a "temp" agency at the time and that Mrs. Marks is also employed.

Detective Frank Miller testified for the Board. Detective Miller investigated the homicide of Corey Harrison, the alleged assailant in this case. Harrison was shot on September 23, 2006, "within 50 feet of where Mr. Marks was shot." Detective Miller testified that there were suspicions of a relationship between appellant and Harrison:

> Initial indications from the Eastern District said that there may be some relationship to Mr. Marks' case and my victim, Harrison.

Q Okay.

A And I, while investigating that, Mr. Harrison's case, some detectives from the Eastern District had occasion to interview Mr. Marks on September 25th.

Q Did you have a discussion with those detectives?

A Yes.

Q Okay.

A And that's Sergeant Maureen R. Jones and Darrilynn Walker, who's the detective at the Eastern District. They showed Mr. Marks a photographic array. It's basically six photographs made up of people of similar characteristics and a target. Their target was Corey Harrison, ... my victim.

> Mr. Marks, his mouth was wired shut. He was—he would have difficulty communicating, but he made a positive ID of Corey Harrison as the individual shot.

> During my investigation, I was concerned that there was a possibility of, hey, you know, okay, this guy is dead, they got a shooting, you know, they're just going to clear their shooting with my murder victim just because, you know, close proximity.

So I was concerned, and basically about my investigation, so my partner and I went to Johns Hopkins, interviewed Mr. Marks ourselves.

Q Who's your partner, for the record?

A Brian Kershaw.

Okay. Continue, sir.

A Again, Mr. Marks, his mouth was wired, his jaw was wired shut. He could mumble. He couldn't speak very well, but we had an alphabetic board. We would ask him questions and he could verify yes or no, and he would make hand gestures.

We talked about, what's this over, and you know, is it over territory? Is it over, you know, you guys, you have something blowing back and forth. And the indication was, it was over territory.

Q What did you understand territory to mean?

A Over drug territory.

\* \* \*

The ability to sell in that neighbor[hood] and sell, you know, certain drugs.

His indication to me and how I took the interview was Mr. Marks was the big player, he controlled the larger of the area. Mr. Harrison mainly dealt on Robb Street, but yet he wanted to control the larger area.

Q Meaning Mr. Harrison wanted to control the entire area?

A Correct.

\* \* \*

Right. Mr. Marks even said that after the shooting, someone from the neighborhood came to him and said it was taken care of, meaning that Mr. Harrison had been killed for Mr. Marks.

Mr. Marks indicated he didn't ask anybody to go do it.

Q He indicated that to you himself?

A Yes. He didn't ask anybody to go do it, but it was done and someone had come to the hospital and told him it was done.

Q Okay.

A I asked him if he was angry at Harrison for shooting him, and he indicated no. It was like this was expected because of the life that they were living. He kind of shrugged his shoulders about it, like, oh, you know, it happened.

Q Okay.

A And that was the only dealing I had with Mr. Marks, just that one day at—

Q What's the date of that day?

A The date was either—it was either September 25th or 26th.

Following this testimony, appellant, on further examination by counsel, insisted that he could not recall any conversation with Detective Miller. He explained that he had not been in any condition to speak and thus any meaningful conversation with Detective Miller would have been impossible. His mouth had been wired shut with a heavy gauge, he had been heavily sedated with morphine, and he was unable to recognize even family members.

Detective Miller was recalled to the stand to explain his testimony in view of appellant's emphatic denials. Detective Miller described appellant when he encountered him:

He's—he's in pain, he's alert, he was awake. His right arm ... was in a sling. His left arm was by his side. He could, he could explain motions. He could grunt and make gestures. He could shake his head. He could respond when asked a question, and it appeared to me that he was responding, you know, openly and honestly because anybody who's ever dealt with the police department, obviously, if the drug detective walked in there, he's not going to tell a guy about the drugs. I'm not there about that. I don't

care about it. . . . I can't stop crime if I'm worried about (unintelligible) drugs because nobody will talk to me.

\* \* \*

So we gained a lot of drug information that's, you know, that's just put out there. And he explained that this is— that's the neighborhood. He's been in it all his life. Corey Harrison has been there most of his life, and they occupied the same territory.

Q When you were getting this information from Mr. Marks, did you ever have any sense that he was incoherent?

A No.

Q Okay. Did you have any sense that he could not, that he didn't know what he was talking about?

A No. No, not at all.

On cross-examination by appellant's counsel, Detective Miller testified that he discovered that appellant was not as "heavily sedated" as he had been led to believe. He recounted that, when he went to the hospital to interview appellant, he asked the nurse whether appellant was able to communicate. Counsel further inquired:

[APPELLANT'S COUNSEL:] Okay. I just have one more. Just I'm struck on the fact that there's explicit details in this statement that you, you know, on 3/30/07 that Ms. McKoy put in her claim summary, and I just—I don't understand how such detail could have been extracted from somebody who was in the state that he was in, even if he could . . . nod or . . . make some kind of gesture, it just seems—I just still don't understand how you could get those kind of details.

\* \* \*

Like, okay—go through rival dealers, dispute over territory, majority of the neighborhood. I mean, that's very specific, and I guess, how were you able to extract that level of detail from him in the state that he was in?

A That's a closed question, yes or no. Just, you know, is—does Corey run the neighborhood or do you run the

neighborhood; is it a dispute over drugs. They were yes or no questions.

Q But how were you able to know that he understood the context of the conversation in the first place?

A If he didn't understand, he wouldn't answer, and then we'd start over. We would ask a different question to make it a yes or no question. He couldn't give me, you know, I run the territory because (unintelligible) off of 20th. He couldn't tell me that because he couldn't talk.

There were times when we were initially using the, they had a big alphabet board, so they could communicate with, where you're putting up letters and you would go through A, B, C, to extract a word from him to put into a sentence. And then, you know, as we get, you know, two or three words in there, we start, okay, so is it about drugs, is it about territory.

Q So he actually constructed a word—

A Yes

Q —to identify the fact that he understood what this conversation was about?

A Yes.

Q He actually said, "Yes, drugs."

A Yes.

Q Okay. Okay.

Karen Marks, appellant's spouse, also disputed the detective's account, and insisted that appellant had been in a coma for 21 days from September 17th, and that he could not even communicate with flash cards. Detective Miller testified in rebuttal:

Well, sir [addressing a Commissioner], he was visited twice on the 25th of September by four detectives, one of which is a supervisor. He was awake and alert on two separate occasions.

[COMMISSIONER ROBERTS:] And those are a part of your investigative notes, correct?

A Yes, sir.

Q And the investigative notes of the other detectives, correct?

A Yes, sir.

Q Part of that interview included a lineup, correct?

\* \* \*

A Their interview included a lineup, yes, sir.

Q As you were told.

A Yes, sir.

Q And as a result of that, Mr. Harrison was positively identified, is that correct?

A Correct.

Lemuel Watson, a friend of appellant's family from the neighborhood, confirmed that appellant would come by to check on his mother's house, and would also visit the neighborhood with his son for bike rides. Mr. Watson had seen Corey Harrison in the neighborhood, but could only recall a single issue between Harrison and appellant, and that involved one of appellant's bicycles. When asked whether he had heard about appellant being involved in the drug trade, Watson testified:

> No. Not in any that I know, and all the times that I've known him. No, I'd like to say bout that, as far as that goes, I probably go off the point, but, you know, he and I have had a lot of conversations about just being older men now and being responsible and all that. . . .
>
> But, as far as he and I, you know, we got families, we got wives, we got our children, you know. . . .

Anthony Ivory was appellant's next-door neighbor, and had known appellant for some time. He confirmed that appellant would come to the neighborhood to check on his mother's house. Ivory noted that the house had been broken into at one point. Ivory did not know Corey Harrison, and was not "aware of any kind of dispute, drug related or otherwise between Mr. Marks and anyone in the neighborhood."

## The Decisions Below

On October 24, 2008, the Board issued an amended decision denying the claim. The Board credited the testimony of Detective Miller. It also discounted the appellant's testimony, explaining:

> The claimant stated at the hearing that the incident occurred when he was checking on a house owned by his mother. The claimant gave conflicting stories about whether the house was occupied by tenants or was vacant at the time of the shooting. In addition, during the investigation of the claim, the claimant told Investigator McKoy that he had over $1,000 in cash in his possession at the time of the shooting, yet had been unemployed for several months prior to the shooting and even when employed was working as a warehouse laborer and reported no other source of income. In addition, Ms. McKoy was informed by the Howard[5] County State's Attorney's Office that the claimant was classified in his prior criminal record as a drug "King Pin". After the shooting, the claimant went back into the house before seeking medical and police assistance.

The Board concluded:

> The Board concludes after reviewing the file, the evidence submitted, and after due deliberation that the credible testimony of Detective Miller together with the results of the Board's original investigation confirms the original conclusion that the claimant was shot as a result of participation in illegal activity; therefore the claimant's conduct contributed to the infliction of his injury. The claimant's own actions as noted above strongly suggest the conduct of a drug dealer engaged in his illegal activity and taking care to secure his product before seeking help.

This decision was upheld by the Secretary. On appellant's petition for judicial review, the circuit court concluded that the Board's decision was supported by "substantial evidence that the Petitioner's conduct contributed to his injuries." The

---

5. Appellant's record suggests that this charge was in Harford County.

circuit court noted that its review was limited, and that the resolution of factual issues was within the Board's discretion. At the hearing the court pointed out:

What effectually I have is presented by [counsel] that I shouldn't believe the testimony of Detective Miller because it is not—it was the statement of Detective Miller concerning Mr. Marks' statement which is clearly a hearsay statement, was not done in a way that leads to its admissibility. That leads to the issue concerning its viability.

But again the ... Board had the opportunity to assess Detective Miller he presented information about how he got the statement from Mr. Marks. Then Mr. Marks had the opportunity to testify as to the fact that he doesn't remember giving the statement.... [T]hat's still for the Board to make its determination as to who is credible and what the credible testimony means.

We shall recite additional facts as necessary to address the issues before us.

## DISCUSSION

### Standard of Review

An appellate court, "[w]hen reviewing the decision of an administrative agency ... review[s] the agency's decision directly, not the decision of the circuit court." *Comptroller of the Treasury v. Science Applications International Corp.*, 405 Md. 185, 192, 950 A.2d 766 (2008) (citations omitted). This Court will apply the identical standard of review as that employed by the circuit court. *Spencer v. Board of Pharmacy*, 380 Md. 515, 524, 846 A.2d 341 (2004) (citations omitted); *Neal v. Criminal Injuries Compensation Board*, 191 Md.App. 664, 668, 993 A.2d 175 (2010). *See Motor Vehicle Admin. v. Shea*, 415 Md. 1, 15, 997 A.2d 768 (2010) (appellate court "looks through" circuit court's decision while applying same standards of review) (citations omitted); *Thanner Enterprises, L.L.C. v. Baltimore County*, 414 Md. 265, 275, 995 A.2d 257 (2010) (same).

Judicial review of the Board's decision is "authorized by Maryland Code [ (1984, 2009 Repl.Vol.) ], section 10–222 of the State Government Article [ ("State Gov't"), the judicial review provision of the Maryland Administrative Procedure Act]." *Johnson v. Criminal Injuries Compensation Board,* 145 Md. App. 96, 105–06, 801 A.2d 1092 (2002).

Section 10–222(h) of the State Government Article provides: § 10–222.

\* \* \*

(h) In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

 Pursuant to State Gov't § 10–222, " 'Maryland courts play a limited role when reviewing adjudicatory decisions of administrative agencies[,]' " *Motor Vehicle Admin. v. Dove,* 413 Md. 70, 79, 991 A.2d 65 (2010) (quoting *Motor Vehicle Admin. v. Shepard,* 399 Md. 241, 251, 923 A.2d 100 (2007)), and a court's role in conducting this review is "very narrow." *Shepard,* 399 Md. at 252, 923 A.2d 100 (citing *Maryland Aviation Admin. v. Noland,* 386 Md. 556, 570–71, 873 A.2d 1145 (2005)). We are obliged "to review the agency's decision in the light most favorable to the agency, since their decisions are *prima facie* correct and carry with them the presumption of validity." *Grasslands Plantation, Inc. v. Frizz–King En-*

*terprises, LLC,* 410 Md. 191, 204, 978 A.2d 622 (2009) (quoting *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 569, 709 A.2d 749 (1998)) (internal quotation marks omitted).

 Our review of an agency's determinations of law is plenary, although an agency's interpretation of its organic statute is entitled to some deference. *Total Audio–Visual Systems, Inc. v. Dept. of Labor,* 360 Md. 387, 394, 758 A.2d 124 (2000) (citations omitted). *See Spencer,* 380 Md. at 529 n. 3, 846 A.2d 341. "While we frequently give weight to an agency's experience in interpretation of a statute that it administers, it is always within our prerogative to determine whether an agency's conclusions of law are correct." *Kushell v. Dept. of Natural Resources,* 385 Md. 563, 576, 870 A.2d 186 (2005) (citations omitted). *See Adventist Health Care, Inc. v. Md. Health Care Comm'n,* 392 Md. 103, 121, 896 A.2d 320 (2006).

 "When the agency is acting in a fact-finding or quasi-judicial capacity, we review its decision to determine 'whether the contested decision was rendered in an illegal, arbitrary, capricious, oppressive or fraudulent manner.' " *Baiza v. City of College Park,* 192 Md.App. 321, 331, 994 A.2d 495 (2010) (quoting *Dept. of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 224, 334 A.2d 514 (1975)). The findings of fact by the administrative agency are reviewed under a deferential "substantial evidence" standard. *See Stansbury v. Jones,* 372 Md. 172, 182–83, 812 A.2d 312 (2002). *See generally,* A. Rochvarg, MARYLAND ADMINISTRATIVE LAW § 4.33 at 137–39 (2007). Judicial review "does not involve an independent decision on the evidence." *Johnson,* 145 Md.App. at 107, 801 A.2d 1092. Instead, "[w]e are limited to determining whether there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Neal,* 191 Md.App. at 668, 993 A.2d 175.

Substantial evidence review is narrow; the question is not whether we would have reached the same conclusions, but merely whether "a reasoning mind" could have reached

those conclusions on the record before the agency.... We appraise an agency's fact finding in the light most favorable to the agency, and this deference extends to subsequent inferences drawn from that fact finding, so long as supported by the record. ... Indeed, " 'not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences.' " ... We give great deference to the agency's assessment of the credibility of the witnesses. The agency's determination of factual issues will be upheld if the record of the agency proceeding affords a substantial basis of fact from which the issue can be reasonably inferred.

*Schwartz v. Dept. of Natural Resources*, 385 Md. 534, 554, 870 A.2d 168 (2005) (quoting *Gigeous v. ECI*, 363 Md. 481, 504, 769 A.2d 912 (2001) (citations omitted)). We have pointed out that "great deference is due [the findings of the administrative agency] under the 'clearly erroneous' standard." *Blakehurst Life Care Community/Chestnut Real Estate Partnership v. Baltimore County*, 146 Md.App. 509, 516, 807 A.2d 179 (2002) (citation omitted).

## Introduction

■ The General Assembly enacted the Criminal Injuries Compensation Act in 1968 "for the purpose of enabling innocent victims of certain crimes to receive State-funded compensation for physical injury sustained by them as a result of the crime." *Opert v. Criminal Injuries Compensation Board*, 403 Md. 587, 590, 943 A.2d 1229 (2008) (citing *Criminal Injuries Compensation Board v. Remson*, 282 Md. 168, 171, 384 A.2d 58 (1978)). *See* 1968 Laws of Maryland, Chap. 455, § 1. The legislation was prompted by the General Assembly's express finding of the "need for governmental financial assistance for such victims[.]" *Id. See Criminal Injuries Compensation Board v. Gould*, 273 Md. 486, 496, 331 A.2d 55 (1975). Without a statutory compensation scheme, a crime victim may be left without an adequate remedy at law. *See generally,* Comment, *Criminal Victim's Compensation in Maryland*, 30 MD.

L.Rᴇᴠ. 266, 267–68 (1970). The Act is remedial in nature, and "to the extent possible," must be liberally construed to further its beneficent purposes. *See Opert, supra,* 403 Md. at 594, 943 A.2d 1229 (citations omitted).

### Contributory Conduct

The denial of an award in this case was based on the Board's finding that appellant's conduct contributed to his injuries, thus disqualifying him from entitlement to an award under the Act. Appellant presents a variety of arguments to challenge this finding. Appellant urges that the appropriate standard of causation, by which the effect of a victim's conduct on his injuries is evaluated, is that of "proximate cause," and he claims that the evidence does not meet this standard. He further avers that the evidence does not show that he was participating in a crime at the time he suffered his injuries, and that any past conduct on his part should not preclude his entitlement to an award. Appellant contends that the Board improperly "based its denial solely on an alleged 'continuing circumstance' without citing to any specific behavior or conduct that would foreseeably lead to [his] injuries." Appellant maintains that, regardless of a prior drug-related conviction "from approximately ten years ago," there is "no evidence . . . of his re-engagement in any illegal activities." He adds that the "Board did not (and could not) point to any specific criminal behavior" in denying an award.

In response, the Board contends that appellant has "argue[d] for a cramped interpretation of the statutory term, 'contributed,' " and it rejects appellant's claim that a victim contributes to his injuries, for purposes of the Act, only if the victim is found to have been involved in criminal activity at the time of injury. The Board contends that "there is no [statutory] requirement that the contributory conduct consist of a specific act that occurs at the same time and location as the crime during which injuries are inflicted." The Board does not specifically address appellant's "proximate cause" argument.

## Statutory Provisions

Preliminarily, this petition for judicial review requires us to determine the causation standard by which a victim's conduct is found to have contributed to the infliction of his injuries. Crim. Proc. § 11–810 sets forth conditions for an award generally. Crim. Proc. § 11–810(d) addresses a victim's contributory conduct, and provides in pertinent part:

§ 11–810.

\* \* \*

(d)(1)(i) Except as provided under [a provision not relevant to this case], in considering a claim and in determining the amount of an award, the Board shall determine whether the victim's conduct contributed to the infliction of the victim's injury, and, if so, reduce the amount of the award or reject the claim.

\* \* \*

(3) A claimant may not receive an award if:

(i) the victim initiated, consented to, provoked, or unreasonably failed to avoid a physical confrontation with the offender; or

(ii) the victim was participating in a crime or delinquent act when the injury was inflicted.

While we reserve our holding regarding the Board's findings of fact for later in this opinion, we shall hold that the standard of proximate causation shall apply where the effect of a victim's conduct on the infliction of his or her injuries is to be assessed pursuant to Crim. Proc. § 11–810(d)(1)(i), the provision at issue here, and Crim. Proc. § 11–810(d)(3)(ii).

We begin with an examination of the relevant statutory language. It is well-settled that,

[i]n statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional, or part of the Rules. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole

to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions, and our analysis ends. If, however, the language is subject to more than one interpretation, or when the language is not clear when it is part of a larger statutory scheme, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose, as well as the structure of the statute.

*Friedman v. Hannan,* 412 Md. 328, 337, 987 A.2d 60 (2010) (quoting *People's Insurance Counsel Div. v. Allstate Ins. Co.,* 408 Md. 336, 351–52, 969 A.2d 971 (2009) (citations omitted)).

The Act does not define the term "contribute," but its various provisions offer a statutory context for an inquiry into its meaning. Crim. Proc. § 11–808 sets forth the criteria for a claimant's eligibility for an award, defining, for example, a "victim" or eligible "dependant," extending eligibility to certain Maryland residents who are victims in other states, and explaining "who may file a claim." Crim. Proc. § 11–808(a)–(c). A claimant's eligibility is not unconditional, however, for the Act contains specific provisions that bar entitlement in certain circumstances where the victim's conduct is responsible in some manner for the infliction of his injuries. Crim. Proc. § 11–808(a)(2) precludes an award to a "person who commits the crime or delinquent act that is the basis of a claim, or an accomplice[.]" Crim. Proc. § 11–810 places additional conditions on a claimant's eligibility, providing, *inter alia,* that certain conduct on the part of the victim would disqualify that person from obtaining an award in whole or in part. *See* Crim. Proc. § 11–810(d).

Our concern in this case is with the application of Crim. Proc. § 11–810(d), which in certain circumstances forecloses entitlement to benefits under the Act because of the victim's conduct. Specific disqualifying acts are governed by Crim. Proc. § 11–810(d)(3)(i), which, as noted above, provides for a denial of benefits where the victim "initiated, consented to, provoked, or unreasonably failed to avoid a physical confronta-

tion with the offender." This section is similar to Crim. Proc. § 11–808(a)(2). Neither provision, which addresses conduct directly applicable to the commission of the criminal act at the basis of the claim, applies on these facts.

Crim. Proc. § 11–810(d)(3)(ii) forecloses entitlement where the victim "was participating in a crime or delinquent act when the injury was inflicted." Citing Crim. Proc. § 11–810(d)(3)(ii), appellant contends that "there is no evidence that [he] was participating in a crime." We need not address appellant's argument with respect to Crim. Proc. § 11–810(d)(3)(ii), because Crim. Proc. § 11–810(d)(1)(i), the pertinent provision here, permits the Board to reject a claim if "the victim's conduct contributed to the infliction of the victim's injury." This section addresses conduct generally, and it does not specify that such conduct be unlawful. Nor does it define the term "contributed" or offer guidance as to how a victim's conduct renders him responsible in the infliction of the injuries so as to bar his entitlement to an award under the Act.

### Proximate Cause

■ Appellant maintains that a victim's conduct must be a proximate cause of his injuries in order for an award to be foreclosed.[6] We agree and explain.

The language of the Act as a whole, the context of its enactment, available legislative history, and Maryland cases that have interpreted provisions of the Act, do not reveal any legislative intent regarding the problem of gauging whether and how a victim's conduct "contributed" to the infliction of his

---

6. In his brief, appellant asserts:
 a) The Board cannot deny compensation unless the contributing conduct was in fact the proximate cause of Victim's injuries.
 b) There is no evidence in the record that the Victim's own conduct proximately caused his injuries.
 c) The rules of statutory construction do not allow for a denial of Victim's claim based on Md.Code Ann.Crim. P. § 11–810.
 d) Even assuming the Board's allegations of drug activity are correct, the Board still did [not] present sufficient evidence of contributory conduct.

injury.[7] What is clear, however, is that a victim must be responsible for his or her actions, and where there is some nexus between the victim's conduct and the "compensable" injury, the victim/claimant may forfeit an award in whole or in part. The question of whether a victim's conduct must be a proximate cause of his injuries so as to foreclose an award under the Act appears to be a matter of first impression in Maryland.

After reviewing decisions from sister jurisdictions under their respective victim's compensation statutes, we shall conclude that a victim's conduct must be a "proximate cause" of his injury before he would be disqualified from an award pursuant to Crim. Proc. §§ 11–810(d)(1)(i) and 11–810(d)(3)(ii).

"Proximate causation is not a concept susceptible of precise definition." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 713, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (O'Connor, J., concurring). In a case involving restitution, the Court of Appeals has noted that "tort scholars have described the 'art' of determining proximate cause," and that there is "nothing in the entire field of law which has called forth more disagreement, or upon which the

---

**7.** As enacted in 1968, the Maryland statute was "modeled upon the New York statute, adopted in 1966[.]" *Criminal Injuries Compensation Board v. Gould,* 273 Md. 486, 497, 331 A.2d 55 (1975). The Maryland statute as enacted in 1968 provided in pertinent part:

In determining the amount of an award, the Board or Board members, as the case may be, shall determine whether, because of his conduct, the victim of such crime contributed to the infliction of his injury, and the Board or Board Member shall reduce the amount of the award or reject the claim altogether ...

1968 Laws of Maryland, Chap. 455, § 1. Codified in Md.Code (1966 Supp.), Art. 26A, § 12(e). This language is virtually identical to the relevant section of the New York statute as enacted in 1966. *See* 1966 Laws of New York, Chap. 894 (codified in N.Y. Exec. Law, Art. 22 (McKinney, 1972)). Section 631.5 of the New York Act then provided in pertinent part:

In determining the amount of an award, the board or board member, as the case may be, shall determine whether, *because of his conduct,* the victim of such crime contributed to the infliction of his injury, and the board or board member shall reduce the amount of the award or reject the claim altogether ...

Exec. Law. § 631.5 (emphasis added).

opinions are in such a welter of confusion." *Pete v. State,* 384 Md. 47, 60 n. 15, 862 A.2d 419 (2004) (citations and internal quotation marks omitted).

In a negligence case, Judge McAuliffe stated for the Court in *Atlantic Mutual Insurance Co. v. Kenney,* 323 Md. 116, 127–28, 591 A.2d 507 (1991): "In order to be a proximate cause, the negligence must be 1) a cause in fact, and 2) a legally cognizable cause." As to the latter element, the Court emphasized the importance of the foreseeability of harm resulting from the actor's negligence. *Id.* at 130, 591 A.2d 507 (citing cases). More recently, Judge Raker elaborated on the issue of proximate cause:

> Legal cause and proximate cause has been widely discussed in cases and legal literature and has posed obstacles to recovery for victims for generations.... The principles have been set out, explored, explicated and expanded.... It is a basic principle that "[n]egligence is not actionable unless it is a proximate cause of the harm alleged." ... Proximate cause "involves a conclusion that someone will be held legally responsible for the consequences of an act or omission." ... To be a proximate cause for an injury, "the negligence must be 1) a cause in fact, and 2) a legally cognizable cause." ... In other words, before liability may be imposed upon an actor, we require a certain relationship between the defendant's conduct and the plaintiff's injuries. The first step in the analysis to define that relationship is an examination of causation-in-fact to determine who or what caused an action. The second step is a legal analysis to determine who should pay for the harmful consequences of such an action.

*Pittway v. Collins,* 409 Md. 218, 243–44, 973 A.2d 771 (2009) (citations omitted).

The Court of Appeals has also observed:

> Proximate cause ultimately involves a conclusion that someone will be held legally responsible for the consequences of an act or omission. This determination is subject to considerations of fairness or social policy as well as mere causa-

tion. Thus, although an injury might not have occurred "but for" an antecedent act of the defendant, liability may not be imposed if for example the negligence of one person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury ... or if the injury is so remote in time and space from defendant's original negligence that another's negligence intervenes.

*Peterson v. Underwood,* 258 Md. 9, 16, 264 A.2d 851 (1970) (citations omitted). *See Baltimore Gas & Electric Co. v. Lane,* 338 Md. 34, 51–52, 656 A.2d 307 (1995).

Applying this analysis in the context of this case would mean that, for the victim's conduct to preclude a claimant's entitlement to an award, it would have to be a proximate cause of the injury that forms the basis of the claim. If the "harmful consequences" of the victim's conduct are foreseeable, and not attenuated by an intervening action, the conduct is a proximate cause of, and can thus be said to "contribute" to, the infliction of the victim's injuries. By assessing a victim's conduct in terms of responsibility for the foreseeable consequences of his or her conduct, even where a consequence may entail injury to that victim, the application of a proximate cause standard by which that conduct is judged furthers the legislative purpose of compensation for innocent victims of crime.

Notwithstanding the absence of Maryland authority on this issue, cases from sister jurisdictions have examined the use of causation analyses in determining whether a claimant's conduct contributed to his injury. These cases are instructive.

In *McMillan v. Crime Victims Compensation Board,* 155 Mich.App. 358, 399 N.W.2d 515 (1986), the Michigan intermediate appellate court reversed the denial of compensation benefits to a claimant who had been shot while present in an unlicensed bar. The victim's presence in the bar constituted a misdemeanor, and this infraction provided the basis for the

administrative denial of the claim.[8] The Michigan intermediate appellate court reversed. The court set forth the conflicting approaches to the causation analysis advanced by the board and the victim and its explanation of its employment of a "proximate cause" test warrants extensive quotation:

> We believe . . . the narrow scope of coverage of the act . . . does not require an interpretation so restrictive as to thwart the legislative intent to aid crime victims. Therefore, in this case, we reject the board's interpretation of the statutory term "contributed to the infliction of his injury." The board, under its interpretation, holds that any time a claimant violates any criminal statute and the violation of the criminal statute is in any way a cause in fact of the claimant's injury, the claimant has "contributed to the infliction of his injury." Such an interpretation would lead, in some situations, to results that would appear to be contrary to the Legislature's intent to aid certain crime victims who are not blameworthy in causing their injuries. We do not believe that the Legislature, through MCL 18.361(4); MSA 3.372(11)(4), intended to prohibit recovery to a crime victim who was not in any way truly blameworthy for his injury.
>
> We also reject the other possible extreme literal interpretation of the term "contributed to the infliction of his injury" that would require an injured person to have contributed to the actual act of inflicting his injury before being denied recovery. Under this other interpretation, the injured person would have to have helped pull the trigger or thrust the knife which caused his injury in order to allow the board to reduce or deny an award. We do not believe the Legislature intended either extreme result in using the term "contributed to the infliction of his injury."
>
> Rejecting these somewhat extreme interpretations of the statutory term in question leaves us in a situation where each case in which the claimant has engaged in some possible peripheral criminal conduct that may have been

---

**8.** *Compare* Crim. Proc. § 11–810(d)(3)(ii) (award barred if victim was participating in a crime or delinquent act).

connected with his injury must be decided in the light of its particular facts.

... The determination of whether a victim "contributed to the infliction of his injury" involves an assessment of the particular factual situation similar to that used in determining whether a defendant's negligent acts were a proximate cause of a plaintiff's injuries. The test used in determining proximate cause involves assessing the foreseeability that the injury would result from the defendant's acts. If the injury which resulted from the defendant's acts is deemed too remote or unforeseeable, the defendant's acts are not held to be a proximate cause of the injury and the plaintiff cannot recover damages from defendant.

\* \* \*

In applying the general proximate cause type of foreseeability test to the facts of this case, we believe the board erred in finding that the claimant contributed to the infliction of his own injury. His violation of a criminal statute in this case merely involved his knowing presence in an unlicensed bar. The risk of being shot while merely present in an unlicensed bar is too remote and unforeseeable to hold him blameworthy in any way for his injuries.

\* \* \*

Thus, as a matter of judicial policy, we do not choose to treat claimant's illegal presence in the bar as a "proximate cause" of his injuries, since a gunshot injury was not a reasonably foreseeable risk of his act of entering an unlicensed bar. Therefore, we conclude that he did not "contribute to the infliction of his injury," for purposes of the statute, by being present in the unlicensed bar, and the board erred in denying his claim on this basis.

*McMillan,* 399 N.W.2d at 518–20.

In *Evans v. N.C. Dept. of Crime Control,* 101 N.C.App. 108, 398 S.E.2d 880 (1990), the Court of Appeals of North Carolina held that,

where a claimant's injuries are a direct result of the criminally injurious conduct of another, the claimant's own mis-

conduct must have been a proximate cause of those injuries in order for the [Crime Victims Compensation] Commission to deny or reduce the claim under the statute.

*Evans,* 398 S.E.2d at 885.

The standard set forth in *Evans* was further applied in *McCrimmon v. Crime Victims Compensation Commission,* 121 N.C.App. 144, 465 S.E.2d 28 (1995). In the latter case, the claimant grabbed a $20 bill from a convenience store customer and started to flee. He was shot by the store proprietor and was paralyzed as a result of the wound. The store owner was charged with assault and the victim charged with larceny. The victim's claim for compensation was denied by the North Carolina commission and he appealed. He argued that being shot by the store proprietor was not a foreseeable result of his theft of a customer's money. The commission disagreed, and the North Carolina Court of Appeals affirmed. The intermediate appellate court explained:

> However, petitioner maintains that "the act of Mr. Sineath was not reasonably foreseeable and therefore, by application of tort principles, [petitioner's attempt to steal the money] was not contributory misconduct" so as to justify reduction or denial of petitioner's claim under the statute. We believe petitioner misapprehends the purport of "contributory misconduct."

> While "contributory misconduct" is not defined in the Act, this Court has previously interpreted the phrase. *Evans v. N.C. Dept. of Crime Control,* 101 N.C.App. 108, 118, 398 S.E.2d 880, 885 (1990) ... "Misconduct" is behavior that is "unlawful or ... breaches the standard of conduct acceptable to a reasonable person." *Id.* Further,

>> in order for [a] claimant's misconduct to be contributory [under the Act] it must combine with criminal action on the part of another to become a 'real, efficient and proximate cause of the injury.'

*Id.* at 117, 398 S.E.2d at 885 (citation omitted). A proximate cause is one which

in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all facts as they existed.

*Id.* . . .

The test under *Evans*, therefore, is two-pronged, that is, 1) was there misconduct on the part of petitioner and, if so, 2) was that misconduct a proximate cause of his injury?

\* \* \*

Regarding the element of proximate cause, petitioner takes issue with the Commission's conclusion that "it was reasonably foreseeable to the Petitioner that his illegal acts could result in injury to himself." However, this Court in *Evans* pointed out that:

The test of foreseeability as an element of proximate cause does not require that the actor should have been able to foresee the injury in the precise manner in which it actually occurred.

Therefore, petitioner need not necessarily have been able to foresee that his conduct would lead to his being shot, but only that "consequences of a generally injurious nature[ ] [were] probable under all the facts as they existed." . . . Indeed, in certain instances "the intervention of wrongful conduct may be the very risk" a person creates through his or her own misconduct . . . and such intervention accordingly is foreseeable.

*McCrimmon v. Crime Victims Compensation Commission,* 465 S.E.2d at 30–31 (citations omitted). *Cf. Fisher v. Kansas Crime Victims Compensation Board,* 280 Kan. 601, 124 P.3d 74, 83–84 (2005) (without adopting specific standard, court cites to "comparative fault" or "proximate cause" analyses for guidance for compensation board to analyze causation issue).

We agree with the analyses by the intermediate appellate courts of Michigan and North Carolina, and shall adopt a

"proximate cause" standard for assessing whether a victim's conduct contributed to his injuries so as to preclude an award under the Act pursuant to Crim. Proc. §§ 11–810(d)(1)(i) or 11–810(d)(3)(ii).

### *Conduct in this Case*

The Board found that appellant's "illegal conduct"—his participation in the narcotics trade—precluded an award.[9] Broadly stated, the contributory conduct was appellant's participation in the narcotics trade, which led to conflicts with rival dealers, in particular Corey Harrison.

There can be no serious dispute that there is an intimate relationship between violence and drugs. *See, e.g., Nance v. State,* 331 Md. 549, 555, 629 A.2d 633 (1993) (alleged drug turf war that ostensibly provoked shooting); *Handy v. State,* 175 Md.App. 538, 552, 930 A.2d 1111 (quoting trooper's reference about drug wars), *cert. denied,* 402 Md. 353, 936 A.2d 851 (2007). *See generally United States v. Wilson,* 605 F.3d 985, 999 (D.C.Cir.2010) (noting gang's monopoly on drug sales within "turf" "strictly enforced"); *United States v. Aviles–Colon,* 536 F.3d 1, 18 (1st Cir.) (observing that gang was often at war with other drug organizations over drug "turf."), *cert. denied,* 555 U.S. ——, 129 S.Ct. 615, 172 L.Ed.2d 470 (2008); *United States v. Carson,* 455 F.3d 336, 340 (D.C.Cir.2006) (noting "widespread violence that runs through this case begins . . . with the murder of . . . a victim in a drug-dealing turf war."), *cert. denied,* 549 U.S. 1246, 127 S.Ct. 1351, 167 L.Ed.2d 146 (2007); John A. Powell & Eileen B. Hershenov, *Hostage to the Drug War: The National Purse, the Constitution and the Black Community,* 24 U.C.Davis L.Rev. 557, 608 & nn. 209–10 (1991) (noting expert agreement that increase in violent crime

---

**9.** We do not interpret the Board's decision as a finding that appellant was engaged in a *specific* criminal act as that term is defined in Crim. Proc. § 11–810(d)(3)(ii). It is clear from the context of the Board's opinion and the record that the "illegal conduct" that barred an award in this instance was appellant's general participation in the narcotics trade in that neighborhood.

attributable to profits from drug trade and "turf wars of drug dealers").

A shooting victim who becomes a casualty in a drug "turf war" because of perceived allegiance to, and participation with, one side of a drug rivalry, may be considered a "foot soldier" in the internal drug wars over turf and influence. The risks of such participation are foreseeable. Indeed, according to Detective Miller's testimony, which the Board credited, appellant had indicated that "this was expected because of the life that they were living. He kind of shrugged his shoulders about it, like, oh, you know, it happened." [10]

But a claimant's participation in narcotics dealing would not *per se* meet the contributory conduct test. Appellant maintains that his conduct was not a proximate cause of his injuries. We disagree.

Appellant's reliance on *Fisher* and *McMillan,* both *supra,* is misplaced. The administrative tribunal that denied benefits in *Fisher v. Kansas Crime Victims Compensation Board* failed to determine whether the victim's conduct in that case contributed to his injury. No causation inquiry had been conducted. Moreover, unlike the case before us, the facts in *Fisher* were not in dispute. *Fisher,* 124 P.3d at 78. In *McMillan,* the Michigan court concluded that the victim's injury was not a reasonably foreseeable risk of his supposed misconduct, and thus was not a proximate cause of his injury. *McMillan,* 399 N.W.2d at 520. Unlike the victim's conduct in *McMillan,* the consequences of appellant's conduct in the case *sub judice* were reasonably foreseeable. Again, as pointed out above, Detective Miller testified that appellant anticipated trouble "because of the life that they were living." The Board could

---

**10.** Citing a decision by the Ohio Court of Claims in *In re DeCerbo,* 5 Ohio Misc.2d 11, 449 N.E.2d 526 (Ohio Ct.Cl.1982), appellant contends that there is no evidence that he "re-engaged" in his prior illegal activity, and that "[n]o evidence exist[s] to establish a nexus between Victim's prior acts from nearly a decade ago and the incident occurring in September 2006." This argument is undermined by Detective Miller's testimony. *In re DeCerbo* is thus inapposite.

find that appellant could reasonably foresee the risks that were inherent in running a drug trade.

Similarly, our decision in *Johnson v. Criminal Injuries Compensation Board, supra,* does not preclude the result we reach today. In *Johnson,* we noted the following facts:

> Detective Nevins of the Baltimore City Police Department's Homicide Unit investigated the incident in which appellant was injured. The Board's investigator was informed by Detective Nevins that (1) appellant was one of four people injured in this incident, (2) no suspects had been apprehended, (3) appellant was a "known" drug dealer, (4) the area in which the shooting occurred was the appellant's "territory," and [ (5) ] Detective Nevins believed that the shooting was "drug related." Because of the information provided by Detective Nevins, the Board's investigator recommended that the Board deny appellant's claim.

*Johnson,* 145 Md.App. at 102, 801 A.2d 1092. On the basis of this evidence, the Board concluded that Johnson was not an innocent victim. Johnson had not requested a hearing before the Board, but sought judicial review after the Board's decision. We reversed the denial of benefits and remanded. After noting the appropriate burden of persuasion, we faulted the Board's decision, and also the sufficiency of the evidence, which was largely based on unreliable hearsay:

> In the case at bar, the information supplied by Detective Nevins was not sufficient to generate the issue of whether appellant was shot as a result of his participation in criminal conduct. Thus, the Board erred in requiring that appellant bear the burden of persuading the Board that he did not contribute to his injuries.

*Id.* at 115, 801 A.2d 1092 (footnote omitted).[11] The Board's decision in *Johnson* was based on largely unsubstantiated and

---

11. If the issue of contributory conduct has been generated by the evidence, the burden shifts to a claimant to rule out proximate causation. In *Johnson v. Criminal Injuries Compensation Board,* 145 Md. App. 96, 801 A.2d 1092 (2002), this Court, citing with approval the decision of a New York intermediate appellate court, stated:

unreliable hearsay. Although there was speculation that Johnson had engaged in "drug dealing," and that "territory" was at stake, evidence to support these findings had not been tested at a hearing during which Johnson would confront this speculation directly.

Unlike *Johnson*, a hearing was conducted in the case *sub judice*, and the parties aired the factual issues in dispute. Detective Miller recalled admissions by appellant about dealing in drugs and the occupational hazards of that conduct. Investigator McKoy learned that appellant had a previous record. Both witnesses were subjected to vigorous cross-examination. Although appellant strenuously denied dealing in drugs or engaging in a turf conflict with his assailant, and emphatically denied making any statements at all to the detective, the Board was free to accept or reject his testimony in whole or in part. It is the "agency's province to resolve conflicting evidence and where inconsistent inferences can be drawn from the same evidence it is for the agency to draw the inferences." *Comptroller of the Treasury v. Science Applications International Corp.*, 405 Md. 185, 193, 950 A.2d 766 (2008) (citations and internal quotations omitted).

The testimony of Detective Miller adequately fills in the gaps that undermined the sufficiency of the record in *Johnson*. Given our duty to defer to the findings made and inferences drawn by the Board, provided those determinations are supported by substantial evidence, we must affirm. The suggestion that the Board should not have believed Detective Miller is an argument that is best left to the trier-of-fact. Our task

---

We agree with [the New York cases' interpretation of a similar statute] and hold that, when the circumstances are such that the Board must decide whether the petitioner did or did not contribute to his or her injuries, the petitioner has the burden of persuasion on that issue.

*Johnson*, 145 Md.App. at 112, 801 A.2d 1092 (citing *Callicutt v. Executive Dept., Crime Victims Bd.*, 245 A.D.2d 689, 665 N.Y.S.2d 125, 126 (1997)). In the case *sub judice*, this issue was generated by the testimony of Detective Miller. Accordingly, the burden of persuasion shifted to appellant to establish, by a preponderance of the evidence, that his conduct was not a proximate cause of his injuries.

is not to reweigh the record, and a suggestion that we may do so is an argument that is "wasted on an appellate court." *United States v. Hartmann,* 958 F.2d 774, 780 (7th Cir.1992) (citations and internal quotation marks omitted).

In summary, we agree that the record must establish an element of causation; the conduct must have been contributory. We also conclude that the causation standard is that of proximate cause. The evidence generated this issue, and the burden shifted to appellant to establish by a preponderance of the evidence that any conduct on his part was not "contributory"; appellant was required to establish that his conduct was not the proximate cause of his injuries. The Board's decision to credit the testimony of Detective Miller is supported by substantial evidence, is not irrational, and accords with applicable law.

## Criminal History Information Disclosure

Appellant complains that the Board erred by relying on criminal history information ("CHRI"), the disclosure of which is prohibited by federal and state law. In view of this error, appellant asserts that the denial of benefits must be reversed. We disagree.

A board investigator, Anita McKoy, testified that she queried the CJIS database and determined that appellant had been arrested on previous occasions. This information was apparently derived from appellant's "rap sheet." The Board noted the fact that appellant had once been arrested and charged as a drug "kingpin," but had not been convicted of this charge.[12]

Appellant maintains that the disclosure of CJIS records to an entity such as the Board is unlawful, and that this violation of federal and state laws prohibiting such disclosure was

---

12. *See* Md.Code (2002 & 2006 Supp.), § 5–613 of the Criminal Law Article. "The major objective of the Drug Kingpin Act was to reduce the supply of drugs in Maryland by establishing harsher penalties for drug dealers and by decreasing the profitability of participation in a drug trafficking crime." *Neal v. State,* 191 Md.App. 297, 310, 991 A.2d 159 (citations and internal quotation marks omitted), *cert. denied,* 415 Md. 42, 997 A.2d 792 (2010).

prejudicial. The Board maintains that appellant's challenge to its consideration of his criminal history records information is not before us because he did not object to the use of his criminal record, but instead asserted only that it was not accurate and that the records related to incidents that were too remote.

 We agree that this issue has not been preserved, and that it is not properly before us.[13] Md. Rule 8–131(a) provides, in part, that "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]" The "animating policy behind Rule 8–131(a) is to ensure fairness for the parties involved and to promote orderly judicial administration." *Jones v. State,* 379 Md. 704, 714, 843 A.2d 778 (2004). Unfair prejudice has resulted when a party seeks review of an issue that could have been addressed by the lower tribunal. *See id.*

 This Rule also "applies to appellate review of administrative proceedings." *Parham v. Department of Labor,* 189 Md.App. 604, 615, 985 A.2d 147 (2009) (citation omitted). *See Beeman v. Department of Health,* 107 Md.App. 122, 158–59, 666 A.2d 1314 (1995). Indeed, it is settled law in Maryland that a court ordinarily "may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency." *Motor Vehicle Admin. v. Shea, supra,* 415 Md. at 15, 997 A.2d 768 (citations and internal quotation marks omitted). The application of Rule 8–131(a) in this instance would promote the "orderly administration of justice" by preventing the adjudication of appellant's claim in a piecemeal fashion. *See Jones v. State,* 379 at 715, 843 A.2d 778. Even

---

**13.** Counsel did not object to the consideration of the criminal history information during the testimony of Anita McKoy. Although he complained in his memorandum of law before the circuit court that the Board based its denial on his "participation in some unspecified illegal activity[,]" appellant did not challenge the Board's use of, or access to, his criminal history information records.

assuming that the board investigator gained unauthorized access to appellant's arrest and criminal history (CHRI) records via the CJIS, we would not be persuaded to exercise our discretion to review this issue.[14]

------

**14.** Title 10, subtitle 2 of the Criminal Procedure Article ("Crim.Proc.") governs the "Criminal Justice Information System ("CJIS")." By enacting various provisions addressing the collection, retention and dissemination of criminal history records information, the General Assembly in part sought to "prohibit the improper dissemination of criminal history records information." Md.Code (2008), § 10–202(4) of the Criminal Procedure Article. The "General Assembly enacted the CJIS statute to create a uniform management system for managing CHRI in Maryland." 92 Op. Att'y Gen 26, 34 (2007). The "legislation was designed to ensure that Maryland's system complied with federal regulations." *Id.* at 35. The statute established a CJIS Central Repository in the Department of Public Safety and Correctional Services ("DPSCS")." *Id.*

> The CJIS Central Repository compiles and maintains data of an individual's history of arrests, convictions, and other adverse criminal actions, but CJIS strictly limits access to its data. *See* Maryland Code, § 10–213 of the Criminal Procedure Article (2001); COMAR 12.15.01.08–12.15.01.13 (2003). An ordinary citizen may not obtain criminal history information from CJIS without demonstrating convincingly that the purpose of requesting the data meets one of CJIS's narrow exceptions (*e.g.,* an employer who is seeking background information on a prospective employee whose job could "jeopardize the life and safety of individuals"). COMAR 12.15.01.13. As a result, the CJIS report is not public.

*Attorney Grievance Commission v. Gansler,* 377 Md. 656, 691 n. 19, 835 A.2d 548 (2003).

"Federal and state statutes and regulations enacted since 1975 have limited to some extent the availability of criminal record information. *See* Criminal Justice Information System, 28 C.F.R. § 20.1 et seq. (1985); Maryland Code (1957, 1982 Repl.Vol., 1984 Cum.Supp.) Article 27, § 743 *et seq.* (State Criminal Justice Information System)[.]" *Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 716 n. 10, 501 A.2d 35 (1985). The regulations that implement the "Criminal Justice Information System" provisions of the Criminal Procedure Article are set forth in COMAR Title 12, subtitle 15. While there are sanctions for the improper dissemination of a person's criminal history record information, *see, e.g.,* Crim. Proc. § 10–228 (criminal penalty for actions by employers or prospective employers); 28 C.F.R. 20.25 (civil penalties; curtailment of federal funds), appellant has not directed us to any authority that dictates the remedy he seeks in this case, *viz.* the reversal of an agency decision based in part on improper disclosure of a party's criminal history records information. Further, the exclusion of CHRI from the Board's consideration in this case would be ineffective, given the public availability of similar information in court records.

We are mindful that most of the information appellant seeks to protect is, effectively, readily available as public records because many of the same facts are contained in court files. *See* Md. Rules 16–1001–1011. Such records are available as electronic records subject to retrieval, and "[c]ourt records maintained by a court or by another judicial agency are presumed to be open to the public for inspection." Md. Rule 16–1002(a). Certainly, as Justice Stevens pointed out in the leading case on the confidentiality of "rap sheet" arrest records, "[a]lthough much rap-sheet information is a matter of public record, the availability and dissemination of the actual rap sheet to the public is limited." *United States Dept. of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 753, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). Nevertheless, we perceive no basis for the imposition of some manner of "exclusionary rule" for improper or unlawful disclosures of the CHRI, the application of which would entail a reversal of the Board's decision. Given the penalties that may be imposed in appropriate cases, and the ready availability of alternate sources of nearly identical information, the deterrence rationale for an exclusionary rule in administrative cases such as the one before us is of limited utility.

In the appropriate case, information similar to that contained in a person's "rap sheet" may be the subject of judicial notice by a court or "official notice" by an administrative tribunal. Maryland Rule 5–201 governs the judicial notice of adjudicative facts.[15] State Gov't § 10–213(h) pertains to offi-

---

**15.** Md. Rule 5–201 reads in pertinent part:

(a) **Scope of Rule.** This Rule governs only judicial notice of adjudicative facts. Sections (d), (e), and (g) of this Rule do not apply in the Court of Special Appeals or the Court of Appeals.

(b) **Kinds of facts.** A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

cial notice.[16] With respect to the readily available court records, this Court has taken judicial notice of official entries in circuit court records. *See Stovall v. State,* 144 Md.App. 711, 717 n. 2, 800 A.2d 31, *cert. denied,* 371 Md. 71, 806 A.2d 681 (2002). *See also Swinson v. Lords Landing Village Condo.,* 360 Md. 462, 467, 758 A.2d 1008 (2000) (judicial notice that judgment entered on docket). *But cf. Simms v. State,* 409 Md. 722, 730 n. 8, 976 A.2d 1012 (2009) (Court of Appeals declines to exercise discretion to note adjudicative fact—transcript not in record); *Dashiell v. Meeks,* 396 Md. 149, 176–77, 913 A.2d 10 (2006) (discretion exercised only in exceptional case).

It is widely accepted that judicial notice of court records extends to records that are accessed through the Internet. *See Doe v. Golden & Walters, PLLC,* 173 S.W.3d 260, 265 (Ky.Ct.App.2005) (notice of docket entries via Internet PACER account), *cert. denied,* 546 U.S. 1094, 126 S.Ct. 1069, 163 L.Ed.2d 862 (2006). Indeed, Md. Rule 16–1008(a) provides for

---

(c) **When discretionary.** A court may take judicial notice, whether requested or not.

\* \* \*

(f) **Time of taking notice.** Judicial notice may be taken at any stage of the proceeding.

A court may take judicial notice of "additional facts that are either matters of common knowledge or capable of certain verification.... Included in the latter category are facts 'capable of immediate and certain verification by resort to sources whose accuracy is beyond dispute.'" *Faya v. Almaraz,* 329 Md. 435, 444, 620 A.2d 327 (1993) (citations omitted).

**16.** Section 10–213 of the State Government Article governs evidentiary matters, and provides as follows with respect to "official notice":
 (h) Official notice of facts.—
 (1) The agency or the Office may take official notice of a fact that is:
 (i) judicially noticeable; or
 (ii) general, technical, or scientific and within the specialized knowledge of the agency.
 (2) Before taking official notice of a fact, the presiding officer:
 (i) before or during the hearing, by reference in a preliminary report, or otherwise, shall notify each party; and
 (ii) shall give each party an opportunity to contest the fact.
 Md.Code (1984, 2009 Repl.Vol.), § 10–213(h) of the State Government Article.

the inspection of a court record "to the same extent that the record would be open to inspection in paper form." [17]

In the final analysis, appellant's challenge to the Board's use of his criminal records information is not before us. Moreover, given the ready availability of arrest information via court records and the fact that there is no exclusionary remedy that would compel a reversal of the Board's decision, we see no basis to exercise our discretion to entertain this issue.

### Remaining Contentions

Appellant's remaining contentions require little discussion. He points out that the Court's standard of review is *de novo*. This assertion is correct, but only to the extent we review the legal determinations by the Board. Our review of findings by the Board are more deferential under the substantial evidence standard.

Appellant contends that a denial of benefits runs contrary to legislative policy. We are mindful that,

> it is clear from the statement of legislative policy in CP § 11–802 that the law is remedial in nature, and remedial statutes are to be liberally construed. The Legislature has recognized and articulated that "there is a need for government financial assistance for these victims" and that "[t]he policy of the State is that help, care, and support be provided by the State, as a matter of moral responsibility, for these victims." CP § 11–802. That objective, that policy, is advanced by construing ambiguous language in favor of eligibility.

*Opert v. Crim. Injuries Comp. Bd., supra,* 403 Md. at 602, 943 A.2d 1229. We have no quarrel with appellant's claim that

---

**17.** We take judicial notice that records of the Maryland Judiciary are made available by the Administrative Office of the Courts on the Judiciary website. Maryland Judiciary, *http://www.mdcourts.gov* (last visited October 25, 2010) (Follow "search court records" hyperlink and then follow "case search" hyperlink.). The search yields the same information that appears on a docket sheet.

"[t]here is no question that Victim sustained serious injuries as a result of his victimization." Nevertheless, an award is not made by default solely because a crime victim has filed a claim.[18] Because "the funds to be disbursed under the Act were public funds, the Act was adopted with statutory prerequisites for monetary awards." *Johnson, supra,* 145 Md.App. at 108, 801 A.2d 1092 (citation omitted). Appellant's insistence on entitlement thus overlooks Section 11–810 of the Act, which places conditions on an award. Thus, as noted above, an award may be reduced, or denied outright, if the victim's conduct played a role in the infliction of his injuries. *See* Crim. Proc. § 11–810(d). Had the General Assembly intended that the mere filing of a claim by a victim, without qualification, would conclusively establish entitlement to an award, it clearly would not have enacted CP § 11–810. Where, as here, the Board found that appellant was disqualified on the basis of "contributory conduct," and that finding is supported by substantial evidence, our inquiry is at an end.[19] We emphasize

---

**18.** For example, a study of crime victim's compensation in Maryland recognizes:

> Claims are subject to a number of federal and state eligibility criteria, including: cooperation with law enforcement authorities (generally reporting to police within 48 hours and cooperating with prosecution); lack of contributory misconduct (victims' illegal behaviors that were causally connected to the crime); minimum threshold of losses ($100 in unreimbursable expenses or two consecutive weeks out of work); having exhausted all other means of payment (CICB is the payer of last resort); payment caps (a total cap of $45,000 with caps by categories of expenses as well); and claim filing deadlines (generally within six months of the crime).

Lisa Newmark & Megan Schaffer, *Crime Victims Compensation in Maryland: Accomplishments and Strategies for the Future,* REPORT TO THE MARYLAND GOVERNOR'S OFFICE OF CRIME CONTROL AND PREVENTION at 5 (Urban Institute: Justice Policy Center 2003).

**19.** Indeed, we must affirm the Board's credibility determinations and findings of first-level facts even if we would have drawn different inferences from the evidence. *Cf. Bible v. State,* 411 Md. 138, 156, 982 A.2d 348 (2009) (recognizing that fact-finder may choose among differing inferences from evidence and that appellate court must defer to reasonable inferences regardless of whether it would have chosen different reasonable inference). We will not gainsay the findings of the Board.

that a " 'court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported.' " *Baiza v. City of College Park, supra,* 192 Md.App. at 332, 994 A.2d 495 (quoting *Layton v. Howard County Bd. of Appeals,* 399 Md. 36, 49, 922 A.2d 576 (2007)). Appellant also insists that the Board erred by denying his claim on the basis of past conduct. On the contrary, the Board's decision to credit the testimony of Detective Miller demonstrates its concern that appellant's participation in the narcotics trade was current and on-going.

In the final analysis, we conclude that the Board's decision is supported by substantial evidence based on the record as a whole, that the issue of any improper admission of evidence is first, not properly preserved, and, second, would be harmless, and that the Board did not abuse its discretion by crediting the testimony of Detective Miller. We shall affirm the judgment of the circuit court which in turn upheld the Board's decision.

**JUDGMENT AFFIRMED.**

**APPELLANT TO PAY COSTS.**