899 A.2d 976

**In re JOHN F., Jr. and Shawn F.**

**No. 1741, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

June 2, 2006.

Martha Weisheit (Nancy S. Forster, Public Defender, on brief), for appellant.

Cathy A. Dryden (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel SALMON, KENNEY, and DEBORAH S. EYLER, JJ.

DEBORAH S. EYLER, J.

This is an appeal from orders of the Circuit Court for Washington County, sitting as the Juvenile Court, adjudicating John F., Jr. and Shawn F. Children in Need of Assistance ("CINA"). The appellant is Sherry F., the children's mother. The appellee is the Washington County Department of Social Services ("Department").

The appellant poses two questions for review:

I.  Did the Juvenile Court have jurisdiction in this case when the Department failed to show that the children were residing in Maryland at the time the Petitions were filed?

II.  Did the Juvenile Court improperly rely on hearsay in concluding that the facts alleged in the Petitions were sustained?

For the following reasons, we shall affirm the orders of the circuit court.

## FACTS AND PROCEEDINGS

The appellant is the mother of John F., Jr., born on July 11, 1999, and Shawn F., born on January 16, 2001. The boys' father, John F., participated in the proceedings below but is not a party on appeal. The appellant also has two daughters.

On August 17, 2005, in the Circuit Court for Washington County, the Department filed petitions seeking to have John F., Jr. and Shawn F. declared CINA. The petitions alleged that the appellant's address was an apartment in Hagerstown, and that the boys were living with her.

The petitions set forth the following allegations. On June 7, 2005, the Department received a report of alleged neglect of the boys. The reporter stated that the appellant would come home drunk from work and would not get up in the morning to take John F., Jr. to school. She had taken the boys overnight to Pennsylvania, to the home of her boyfriend, Henry Garland, who had abused her and the boys, and whom she was supposed to stay away from. Garland recently had beaten her up again, and she had a black eye.

The social worker assigned to the case, Sherry Keeney, attempted to visit the appellant's apartment on June 9, 2005, but found no one home.

On June 13, 2005, a former babysitter for the appellant called the Department and reported that Garland had beaten the appellant and made her face "black and blue." When the babysitter stayed with the children, the appellant would come home drunk. John F. was spending time with the appellant; he too was "a drunk." The boys were afraid of Garland, and the babysitter thought Garland was capable of hurting them.

The next day, Keeney met with the appellant at the appellant's apartment. The boys were present. The appellant indeed had a black eye, which she claimed she had gotten from being hit by a ball when she was playing baseball in a game the boys had attended. She also claimed that she had not seen Garland for about a month and that she was working and

receiving substance abuse counseling. She said she had just moved to the apartment on June 13, 2005.

The appellant was supposed to bring the boys to the Department to be interviewed on June 15, 2005, but did not do so. Two days later, Keeney conducted a home visit. The boys were present. The appellant claimed that she missed the June 15 visit because she had had to work and could not call to cancel because she had no telephone. The interview was rescheduled.

On June 20, 2005, Keeney interviewed the boys, separately, at the Department. John F., Jr. reported that the appellant was hit by a ball when she was batting in a baseball game. He said that Garland was "nice and funny" and that their father watched them when the appellant was at work. As the family was getting ready to leave, John F., Jr. said to the appellant, "I didn't tell them anything about Henry."

Shawn F. told Keeney that Garland had kicked the appellant in the stomach, had "busted" her eye, and would not stop hitting her. He also said that Garland hit the boys "everywhere." He reported that the appellant did not play baseball, and he and his brother had never watched her playing baseball. Shawn F. further stated that Garland had been to their new apartment in Hagerstown a few times, and they had gone to Garland's house and slept there. He reported that, when his mother was at work, Garland, "Nana," or the boys' father would watch them. He told Keeney that the appellant drank beer that she called "medicine."

On the same day, June 20, the appellant again told Keeney that she had gotten her black eye from playing baseball. She admitted that Garland had been to their new apartment a few times "at the door."

On June 28, 2005, Keeney attended another home visit with the appellant and the boys. When she attempted to discuss ongoing services, the appellant said, "I'm tired of all this. I'm going to get a lawyer. I just moved back to Washington County. If this is the way it's going to be, then I'll just move back to Pennsylvania." The appellant also said that she did

not have time to drink and that she did not know why it was a problem for Garland to be around the children. The appellant then asked about continuing services from the Department. Keeney told her that she would have to cooperate with the Department to receive those services, and that, if she would not cooperate, legal action would be taken.

The appellant was not served with the petitions until August 25, 2005, the day of the emergency adjudicatory hearing. She was present in the courthouse that day because there was an emergency review hearing in a Termination of Parental Rights ("TPR") case for her daughters. Her lawyer, who represented her in all the cases, was given a copy of the petitions by counsel for the Department. She in turn gave them to the appellant.

In addition to the appellant, John F. was present with counsel at the adjudicatory hearing, and counsel for the children was present. Counsel for the children consented to a CINA adjudication for John F., Jr. and Shawn F., but counsel for the appellant and John F. did not.

The Department's lawyer asked to "proffer the facts and allegations contained in the Juvenile Petition subject to cross-examination[.]" There was no objection to that request, and the court granted it. Counsel for the Department then stated that he was not calling any witnesses, subject to rebuttal.

The appellant's counsel proceeded to cross-examine Keeney. Keeney acknowledged that, on June 14, she had obtained a random urine sample from the appellant that tested negative. However, the most up-to-date information from the counseling center the appellant had said she was attending was that she had just resumed counseling on July 18, and that she had failed to appear for counseling sessions on August 8 and 16.

Keeney also stated that she was not sure where the appellant was living right then, and that she could be living in Pennsylvania. The appellant never notified the Department that she was moving to Pennsylvania, however.

It was undisputed that John F. was residing in Maryland at all relevant times.

At the close of the Department's case, counsel for the appellant moved to dismiss the petitions on the ground of lack of jurisdiction. The court denied the motion.

The appellant testified that she and the boys currently were residing in Pennsylvania. She stated that she had left Garland because he had abused her in Pennsylvania. Garland then moved to Maryland and "don't live in Pennsylvania anymore." The appellant claimed that she had abided by all of the Department service agreements and court orders in the TPR case. She was upset when Keeney first came to visit her because she only had been living in Hagerstown for two days. She would have agreed to a service plan for the boys if she had been presented with one.

On cross-examination, the appellant did not deny that she had gone to Garland's house in Pennsylvania on June 7, 2005, in violation of prior service agreements and court orders directing her to have no contact with him.

Counsel for the appellant informed the court, in response to a question, that the appellant had moved to Pennsylvania the prior Tuesday, which would have been August 16, 2005, the day before the CINA petitions were filed.

After hearing argument of counsel, the court ruled as follows:

Well of course I have to review the credibility of witnesses. I don't think that the Department's case has been rebutted to an extent that I should deny adjudication. As I indicated previously, I adjudicate these two children to be in need of assistance. There is sufficient evidence to warrant same regardless of where [the appellant] is living at this time. And there is no reason to delay disposition. . . .

The children were continued in the legal and physical custody of the appellant, under the supervision of the Department.

The appellant noted a timely appeal.

## DISCUSSION

### I.

■ The appellant contends the Juvenile Court erred by denying her motion to dismiss the CINA petitions for lack of jurisdiction. Specifically, she maintains that the Department did not show that John F., Jr. and Shawn F. were residing in Maryland when the petitions were filed, and therefore did not adduce facts to establish that the Juvenile Court had jurisdiction over them.

The Department responds that the Juvenile Court properly determined that it had jurisdiction over the children. It maintains that the court had jurisdiction over the boys because their father resided in Maryland, they had resided in Maryland within six months prior to the filing of the CINA petition, the court had jurisdiction over the boys' sisters, and there was no credible evidence that the boys' residence was no longer in Maryland.

The Maryland Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), Md.Code (1984, 2004 Repl.Vol.), section 9.5–201 of the Family Law Article ("FL"), sets forth the grounds on which Maryland courts may exercise subject matter jurisdiction in child custody proceedings.[1]  It provides, in pertinent part:

(a) *Grounds for Jurisdiction.* [With an exception not applicable here], a court of this State has jurisdiction to make an initial child custody determination only if:

(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State;

---

1. On October 1, 2004, the Uniform Child Custody Jurisdiction Act, codified at Md.Code (1984, 1999 Repl.Vol.), sections 9–201 to 224 of the Family Law Article, was repealed and replaced by the UCCJEA.

(2) a court of another state does not have jurisdiction under item (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under § 9.5–207 or § 9.5–208 of this subtitle, and:

(i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and

(ii) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under item (1) or (2) of this subsection have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under § 9.5–207 or § 9.5–208 of this subtitle; or

(4) no court of any other state would have jurisdiction under the criteria specified in item (1), (2), or (3) of this subsection.

FL section 9.5–101, in pertinent part, provides the following definitions:

(d)(1) "Child custody determination" means a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child.

\*　　\*　　\*

(e)(1) "Child custody proceeding" means a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue. . . . [It] includes a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, paternity, termination of parental rights, and protection from domestic violence, in which the issue may appear.

\*　　\*　　\*

(f) *Commencement.*—"Commencement" means the filing of the first pleading in a proceeding.

\* \* \*

(h) *Home State.*—"Home state" means:

(1) the state in which a ` child lived with a parent or a person acting as a parent for at least 6 consecutive months, including any temporary absence, immediately before the commencement of a child custody proceeding. . . .

FL section 9.5–101(e)(1) makes plain that the UCCJEA applies to all child custody proceedings, which, by its definition, includes CINA proceedings. Further, Md.Code (1973, 2002 Repl.Vol.), section 3–803(a) of the Courts & Judicial Proceedings Article ("CJP") grants exclusive original jurisdiction over proceedings arising from a CINA petition to the Juvenile Courts.

In *In re Nahif A.,* 123 Md.App. 193, 717 A.2d 393 (1998), we addressed the burden of proof in a challenge to subject matter jurisdiction in a juvenile case. There, the State filed two juvenile delinquency petitions against Nahif in the Circuit Court for Frederick County. The petitions set forth Nahif's birth date. A delinquency hearing was held in the circuit court, sitting as the Juvenile Court. After the close of the State's case, Nahif moved to dismiss, arguing that the State had not proven that the court had subject matter jurisdiction because it had not put on evidence that he was a juvenile. The court granted the State's motion to reopen its case to establish Nahif's birth date. Thereafter, the court adjudicated Nahif to be delinquent.

Nahif appealed to this Court, arguing that the Juvenile Court had abused its discretion by allowing the State to reopen its case. Rejecting that argument, we explained that " 'a prima facie presumption of jurisdiction arises from the exercise of it. It is presumed that jurisdiction over the subject matter and parties has been rightfully acquired and exercised.' " *In re Nahif A., supra,* 123 Md.App. at 212, 717 A.2d 393 (quoting 21 C.J.S. *Courts* § 74 at 91–92 (1990) (footnotes omitted)). Further, " 'the jurisdiction of a court of

general jurisdiction is presumed, unless the contrary is made to appear; and every presumption not inconsistent with the record is to be indulged in favor of such jurisdiction, at least when the allegations of the petition show jurisdiction.' " *Id.* (quoting 21 C.J.S. *Courts* § 74 at 91–92). Accordingly, the burden is on the party challenging subject matter jurisdiction to rebut that presumption. *Id.* at 212–13, 717 A.2d 393.

We held that the delinquency petition and the Juvenile Court's exercise of jurisdiction over the case gave rise to a presumption in favor of subject matter jurisdiction, and that the burden was on Nahif to introduce evidence sufficient to rebut that presumption. Specifically, it was Nahif's burden to show that he was *not* a juvenile. Because he did not introduce any such evidence, he failed to rebut the presumption in favor of subject matter jurisdiction. Instead, he attempted to shift the burden to the State, which was improper. Thus, the Juvenile Court could not have abused its discretion in allowing the State to reopen its case to introduce evidence that Nahif was a juvenile because it was not necessary for the State to do so anyway.

Long before our decision in *Nahif*, the Court of Appeals addressed a related issue in *Austin v. Director of Patuxent Institution*, 245 Md. 206, 225 A.2d 466 (1967). The issue there was whether the circuit court had exceeded its authority under Md.Code (1957), Article 31B, section 5, by granting the State's motion for a new trial after a jury found that Austin was not a "defective delinquent." [2] The Court noted that, although the circuit court is a court of general jurisdiction, it becomes a court of special jurisdiction in defective delinquent proceedings. The court's authority in such proceedings, therefore, is limited to the authority conferred upon it by Article 31B. In explaining the difference between courts of general and special jurisdiction, the Court stated:

A court can be a court of general jurisdiction for some purposes and a court of limited jurisdiction for other pur-

---

**2.** The defective delinquent statute, Article 31B, section 1, *et seq.*, was repealed in 1977. 1977 Md. Laws ch. 678.

poses. When therefore a court of general jurisdiction proceeds under a special statute it becomes a court of limited jurisdiction for the purpose of such proceeding. See 21 C.J.S. Courts § 2. Accordingly, where a court of general jurisdiction undertakes to carry out a special power, a decision made in the exercise of such power is treated as a ruling of a court of limited jurisdiction and the presumption, applicable to a court of general jurisdiction, that it acted within the scope of its jurisdiction does not apply. See 20 Am.Jur.2d, *Courts* § 103.

245 Md. at 209, 225 A.2d 466.

Although it discussed the difference between courts of general and special jurisdiction, the Court's holding was not based upon whether a presumption of jurisdiction existed, but rather upon the scope of a court's authority when proceeding under a special statute. The Court determined that, when the circuit court was ruling on the status of a defendant alleged to be a defective delinquent, it was a court of special jurisdiction exercising a special statutory power. The Court held that the circuit court erred by granting the motion for a new trial. It noted that the power to grant such a motion, although within the inherent power of the circuit court as a court of general jurisdiction, is not within the power of a circuit court with special jurisdiction. Because the authority to grant a new trial was not given to the court by Article 31B, the court lacked the authority to do so.

Returning to the case at hand, the circuit court, sitting as the Juvenile Court in CINA proceedings, is a court of general jurisdiction with jurisdiction over special causes of action set forth by statute, as made plain by the title of CJP Title 3, "Courts of General Jurisdiction—Jurisdiction/Special Causes of Action." Subtitle 8 governs "Juvenile Causes—Children in Need of Assistance," as a special cause. Unlike in *Austin*, in which the circuit court was alleged to have acted outside of its statutorily enumerated powers, the court in this case is alleged to have acted outside of its general jurisdiction over a special cause of action. *See Charley v. Kelley*, 120 Mo.

134, 25 S.W. 571 (1894) (presumptions in favor of jurisdiction apply when circuit court is given cognizance over statutory causes of action in the exercise of its general jurisdiction). Therefore, as we held in *Nahif,* the circuit court sitting as the Juvenile Court in a CINA proceeding is a court of general jurisdiction, and the presumption in favor of subject matter jurisdiction applies.[3]

In the instant case, the CINA petitions were filed in the circuit court, sitting as the Juvenile Court. Pursuant to CJP section 3–803(a), the Juvenile Court had exclusive original jurisdiction over the CINA proceeding. The court also was required to have jurisdiction over the subject matter under the UCCJEA, however. The allegations in the CINA petitions did not suggest that the court lacked subject matter jurisdiction. In fact, the petitions listed the boys' address as being in Hagerstown, where they resided with the appellant. The petitions further stated that the first event leading the Department to file the petitions (the report of alleged neglect) occurred on June 7, 2005, while the boys and the appellant were living in Hagerstown. The petitions then referenced various interactions occurring after that date, between the Department and the boys and the appellant. All of those interactions occurred while the boys and the appellant were living in Hagerstown, with the last interaction occurring on June 28, 2005. The only reference in the petitions to the appellant and the boys living outside of Maryland was the appellant's statement to the caseworker that, "I just moved back into Washington County. If this is the way it's going to be, then I'll just move back to Pennsylvania." The court docketed the case after the petitions were filed and held a

---

3. We note that Article 4, section 1 of the Maryland Constitution makes plain that, unlike the Orphan's Court, the Juvenile Court is not a separately created court. Article 4, section 1 sets forth the courts vested with judicial power in Maryland, which include the appellate courts and "Circuit Courts, Orphans' Courts, and a District Court." The General Assembly may not create additional "courts." *Shell Oil Co. v. Supervisor of Assessments of Prince George's County,* 276 Md. 36, 343 A.2d 521 (1975).

hearing on August 25, 2005. The allegations in the petitions and the Juvenile Court's exercise of subject matter jurisdiction gave rise to a presumption that the Juvenile Court in fact had jurisdiction over the subject matter.

■ Accordingly, the appellant bore the burden of introducing evidence sufficient to rebut that presumption. The only evidence that the appellant put forth on that issue was evidence showing that she was not served at her last known Maryland address; Keeney's testimony on cross-examination that she did not know where the appellant was living, and that she could have been living in Pennsylvania; the appellant's testimony that she in fact moved to Pennsylvania on August 16, 2005, and was living at a temporary address in Pennsylvania at the time of the hearing, and that she had been living in Hagerstown for only two days when Keeney came to her home; and a statement by the appellant's counsel to the court that the appellant "resides back and forth between the states."

Based on these facts, the three grounds on which the Juvenile Court could have had subject matter jurisdiction over this case, pursuant to FL section 9.5–201, are those set forth under subsections (a)(1), (2), and (4). They are that Maryland was the home state of the boys within six months before the petitions were filed and the boys were absent from Maryland, but their father continued to live in Maryland; that a court in another state did not have jurisdiction under the home state analysis and the boys and at least one parent had a significant connection with Maryland and Maryland had substantial evidence about the boys' care, protection, training, and personal relationships; or that no court of any other state had jurisdiction under the statute.

The evidence that the appellant introduced to show that the Juvenile Court lacked subject matter jurisdiction was insufficient to rebut the presumption that the court had jurisdiction over the subject matter. The appellant needed to show that Maryland was not the boys' home state, and that Pennsylvania was. To do that, she needed to at least put on some evidence to show that she had lived with the boys in Pennsylvania for

six consecutive months within the six months before the petitions were filed. She did not.

We note that FL section 9.5–209 requires, in a child custody proceeding, that

each party, in its first pleading or in an attached affidavit, shall give information, if reasonably ascertainable, under oath as to the child's present address or whereabouts, the places where the child has lived during the last 5 years, and the names and present addresses of the persons with whom the child has lived during that period.

If such information is not provided, the court may stay the proceedings until it receives that information, or may require additional information under oath, including through an examination of the parties.

■ In this case, the appellant could not comply with the statute because she was not served until the morning of the hearing, and so did not file an answer. (She could, however, testify about her children's residences during their lives, a fact she had first-hand knowledge about.) The Department neglected to provide in its petition the information required by the statute. During the hearing, the Juvenile Court judge did ask some questions about where the appellant and her children had been living, but neither the court nor the appellant's counsel asked questions to elicit the information required by FL section 9.5–209. It may have been that the parties and the court all had information about the appellant's address history, and that of her children, gained through the TPR proceedings for the appellant's daughters and not in the record in this case. We point this out because FL section 9.5–209 clearly was intended to prevent this very situation. Had the Department complied with the requirements of the statute, the issue of subject matter jurisdiction would have been readily determined. We admonish the Department to take seriously its obligation to comply with FL section 9.5–209 so that needless disputes over subject matter jurisdiction in cases such as this may be avoided. Nevertheless, whether subject matter jurisdiction exists is a legal question that does not turn on satisfac-

tion of the requirements of FL section 9.5–209. For the reasons we have explained, a presumption of subject matter jurisdiction arose in this case and the appellant failed to present evidence sufficient to rebut that presumption. Accordingly, we shall not disturb the Juvenile Court's subject matter jurisdiction ruling.

## II.

The appellant next contends the Juvenile Court erred by improperly relying on hearsay testimony in concluding that the Department had proven the facts alleged in the petitions. Specifically, she argues that the court was unable to weigh the credibility of any Department witnesses because they did not testify. The appellant did not object to the Department's proffer of the allegations in the petitions, or the court's decision to annex the allegations in the petitions, subject to cross-examination of the Department's witnesses by the other parties. Therefore, this issue is not preserved for our review. *See* Md. Rule 8–131(a).

**ORDERS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**