REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2564

September Term, 2014

_____

GRANT AGBARA LEWIS

v.

STATE OF MARYLAND

_____

Wright,
Graeff,
Eyler, James R.
  (Retired, Specially Assigned),

JJ.

_____

Opinion by Eyler, James R., J.

_____

Filed: July 28, 2016

Heidi Bernadzikowski was murdered on April 20, 2000. In 2012, Alexander Charles Bennett was charged with the murder. The State identified Grant Agbara Lewis, appellant, a resident of Colorado, as a material witness. Pursuant to the Uniform Act to Secure Attendance of Witnesses from Without a State in Criminal Proceedings, Md. Code (1973, 2013 Repl. Vol.), §§ 9-301 - 307 of the Courts and Judicial Proceedings Article (the "Uniform Act"), the State obtained an order and summons from a Colorado court requiring appellant to appear and testify at Mr. Bennett's trial.

When appellant appeared in court on the day set for trial, Mr. Bennett pleaded guilty. In his proffer of facts, Mr. Bennett implicated appellant as an accomplice. Appellant was arrested. In the Circuit Court for Baltimore County, he was charged with murder and conspiracy. A jury convicted him, and the court sentenced him to life imprisonment plus five years.

The Uniform Act, discussed more fully below, provides immunity from arrest and service of process for witnesses who come into the State in obedience to a summons. On appeal, appellant argues that the State violated the Uniform Act. Recognizing that he did not raise the issue in circuit court, he contends that, based on the violation, the circuit court lacked subject matter and personal jurisdiction and that jurisdictional issues can be raised at any time.

We hold that the circuit court had both subject matter and personal jurisdiction. Conceptually, therefore, the question becomes whether the court erred in exercising its jurisdiction. The alleged error is one of law and subject to waiver. Thus, we need not reach

the merits, *i.e.*, whether the State violated the Uniform Act and, if so, the effect of the violation and appropriate remedy.

## OVERVIEW

On May 7, 2012, an indictment was filed in circuit court against Mr. Bennett, charging him with the murder of Ms. Bernadzikowski. *See State v. Bennett*, No. 03K12002639, Baltimore County Circuit Court.[1] As detailed below, initially the State identified appellant, a resident of Denver, Colorado, as a material witness in Mr. Bennett's case. The prosecutor took steps to compel appellant to appear and testify at Mr. Bennett's trial. Pertinent to the issue raised on appeal, we have reviewed, and the State accepts, the following from appellant's recitation of facts:[2]

> The steps that the State took to secure Appellant's presence are consistent with the typical steps taken to secure the presence of an out-of-state witness. First, the State's Attorney's Office obtained from Baltimore County Circuit Court Judge Kathleen Gallogly Cox a Certificate for Attendance of Witness From Colorado State ("Certificate"), certifying that Appellant was a material and necessary witness in Bennett's prosecution, and the trial dates

---

[1] We take judicial notice of the docket entries from *State v. Bennett*, found on the Maryland Judiciary CaseSearch website, pursuant to Maryland Rule 5-201. *See Marks v. Criminal Injuries Comp. Bd.*, 196 Md. App. 37, 79 n. 17 (2010) ("We take judicial notice that records of the Maryland Judiciary are made available by the Administrative Office of the Courts on the Judiciary website") (citing http://www.mdcourts.gov); *see also* http://casesearch.courts.state.md.us/casesearch/

[2] This Court granted Appellant's Motion to Supplement the Record with the pertinent documents from *In re: Request for Summons Under Uniform Act to Secure Witness From Outside the State, pursuant to 16-9-202, C.R.S., Regarding Witness*, Case No. 2014CV30367 (Colo. Dist. Ct. 2014).

when Appellant's presence would be required.[3]  App. A.  The Certificate was then provided to the District Attorney's Office for the Second Judicial District of Colorado.  *Id.*  As a result of the Certificate, *In Re: Request for Summons Under Uniform Act to Secure Witness From Outside the State pursuant to § 16-9-202, Regarding Witness*, Case No. 2014CV30367 (Colo. Dist. Ct. 2014), was docketed in the Colorado court.  App. A.  On January 28, 2014, the District Attorney's Office filed the required motion for a hearing, which gave Appellant the opportunity to be heard as to whether he was a material and necessary witness in Bennett's case.  *Id.*  On January 29, 2014, Chief Judge Michael A. Martinez of the Colorado court, citing the Certificate issued by Judge Cox, issued a summons ordering Appellant to appear as a State's witness in Bennett's trial.  App. B.

The Colorado order and summons included the following language:

4)      That the laws of the state in which the prosecution is pending, and of any other state through which the witness may be required to pass by ordinary course of travel, will give to the witness protection from arrest and service of civil and criminal process in connection with matters which arose before entering into that state under this summons; . . .

Appellant's recitation of facts included the following:

Judge Martinez's summons and accompanying order was to become effective upon either the signing and filing of an Acceptance of Service and Waiver of Hearing or the issuance of a summons after a hearing.  *Id.*  The summons and order in Appellant's case became effective on February 7, 2014, after Appellant signed the Acceptance of Service and Waiver of Hearing and it was filed with the court.  App. D.

Appellant arrived in Maryland some time prior to March 18, 2014, the first day of Mr. Bennett's trial.  As noted, Mr. Bennett pleaded guilty to first degree murder.  He was sentenced to life imprisonment with all but thirty years suspended.  As part of the plea

---

[3] The State also obtained a Certificate for Attendance of Witness from Colorado State Clerk's Exemplification.  App. A.

agreement, Mr. Bennett agreed to proffer the details of Ms. Bernadzikowski's murder and to testify in any further proceedings. After Mr. Bennett implicated appellant as an accomplice, the State filed an indictment in circuit court, charging appellant with first degree murder and conspiracy to commit first degree murder.

## BACKGROUND

Although not necessary for resolution of this appeal, as general background information, we shall summarize the evidence at appellant's trial. On the evening of April 20, 2000, Baltimore County police responded to a 911 call from 2008 Codd Avenue in Dundalk, Maryland. They found Steven Cooke holding the dead body of his girlfriend, Ms. Bernadzikowski. Police learned that Mr. Cooke had obtained a $700,000 insurance policy on Ms. Bernadzikowski's life approximately two months before her death. Mr. Cooke was the primary beneficiary on the policy. Several witnesses testified that Ms. Bernadzikowski had planned to leave Mr. Cooke.

Much of the State's evidence at trial came from Mr. Bennett. Mr. Bennett set up an online advertisement for "professional and discreet cleaning services." Mr. Cooke contacted him via email. Mr. Bennett, appellant, and Mr. Cooke planned a murder-for-hire whereby Mr. Bennett and appellant agreed to murder Ms. Bernadzikowski, in exchange for $60,000 from the proceeds of the life insurance policy. Appellant and Mr. Bennett discussed ways to kill Ms. Bernadzikowski without it being detected, including breaking her neck to make her death look like an accident.

4

After reaching agreement with Mr. Cooke, appellant bought Mr. Bennett a plane ticket from Colorado to Baltimore, and Natalie Ott, a friend, drove both of them to the airport the day Mr. Bennett left. Appellant gave Mr. Bennett a map to the home where Mr. Cooke and Ms. Bernadzikowski were living. After he arrived in the Baltimore area in March 2000, Mr. Bennett began watching the victim, communicating his observations to appellant who was in Colorado.[4] Eventually, appellant put Mr. Bennett in contact with Mr. Cooke. Messrs. Bennett and Cooke met twice: once at the residence of Mr. Cooke and Ms. Bernadzikowski, and another time at a bus stop. At the residence, Mr. Cooke showed Mr. Bennett around the house and made clear that he wanted the murder to look like an accident for purposes of the potential insurance claim. Mr. Bennett told Mr. Cooke that he was going to contact appellant to coordinate completion of the crime. Later, at the bus stop, Mr. Bennett told Mr. Cooke that his "boss," referring to appellant, was getting "angry" and wanted to move forward with the crime so that they could get paid.

On the day planned for the murder, Mr. Bennett called appellant. Appellant told Mr. Bennett that Mr. Cooke was going to drop Ms. Bernadzikowski off at their residence in twenty minutes. Mr. Bennett was to go to the residence, where a key to the door would be waiting, and then call appellant and inform him whether the crime had occurred as planned.

---

[4] Mr. Bennett stated that, after he arrived at BWI Airport, he started walking to Dundalk because he did not have any other means of transportation. He was stopped by an MTA police officer while walking on a highway. That stop later became part of the evidence connecting Bennett to the murder.

Mr. Bennett went to the residence, found the key, gained entry, and waited by the front door. He watched through a window as Mr. Cooke and Ms. Bernadzikowski arrived. While Mr. Cooke remained behind, Ms. Bernadzikowski exited the vehicle and entered the residence. At that point, Mr. Bennett grabbed her from behind, put his hand over her mouth, and attempted to break her neck. When that did not work, he wrapped his hands around her throat and choked her until she was unconscious. He put her down and went to find a knife. Returning with a knife, and being unsure whether she was dead, Mr. Bennett cut her throat. During the struggle, Ms. Bernadzikowski scratched Mr. Bennett's face and lip.

After the murder, Mr. Bennett went through the house, trying to create a scene "just to confuse the police." This included writing the number "1" on the wall in lipstick. Mr. Bennett stayed in the house for about thirty minutes after the murder. When asked why, he replied that appellant suggested that, if he did not hear the police after thirty minutes, he would be okay.

After he left the residence, Mr. Bennett disposed of the knife and the key, and then called appellant. Mr. Bennett told appellant the crime did not go entirely as planned, but that it was done. Appellant informed Mr. Bennett that he was monitoring police activity in the area and that "the coasts were clear." Appellant tried, unsuccessfully, to arrange accommodations for Mr. Bennett in Baltimore using a fake credit card. After sleeping in an alley, Mr. Bennett again called appellant and asked him to call Mr. Bennett's sister to help Mr. Bennett return to Colorado. Appellant later contacted Mr. Bennett again and told him

6

it was okay to speak to his sister. Mr. Bennett returned to Colorado. Mr. Bennett and appellant were never paid any of the insurance proceeds.

Other witnesses corroborated portions of Mr. Bennett's testimony. Ms. Ott knew both the appellant and Mr. Bennett. In the spring of 2000, she drove both men to the airport, and was told that Mr. Bennett was going to Baltimore to "make a lot of money." Rebecca Love, the mother of two of appellant's children, testified that appellant told her that he sent Mr. Bennett to kill a woman who lived out-of-state because she owed him money. Ms. Love knew that Mr. Bennett and appellant were "extremely close friends," and that they "[d]id everything together."

In 2000, DNA testing of samples taken from under the victim's fingernails did not result in an identification of the murderer. In 2011, DNA testing of additional samples, with improved technology, resulted in the identification of Mr. Bennett. Detective Gary Childs testified that, in approximately January 2012, after Mr. Bennett's DNA was found under the victim's fingernails, he conducted a search with the Maryland State Police and discovered the record of Mr. Bennett's stop by the MTA Police in March 2000. The investigators then decided to interview Mr. Bennett in Colorado.

In January 2012, during the course of their interview with Mr. Bennett, appellant's name surfaced as a possible alibi witness. The police then interviewed appellant, also in Colorado, solely as a witness in connection with Mr. Bennett's case. Following these interviews, the State's Attorney charged Mr. Bennett with the murder and took steps to

compel appellant to come to Baltimore County to testify as a material witness in the case against Bennett.

As part of his plea agreement with the State, Mr. Bennett agreed to plead guilty and to testify truthfully about his role in the murder of Ms. Bernadzikowski. Mr. Bennett provided details of appellant's role in the murder. Based on this new information, police determined that appellant was not simply a witness, but a suspect. Detective Childs then reinterviewed appellant, explaining:

> On all the previous interviews Mr. Lewis was viewed as a potential alibi witness for the Defendant and he was giving us pieces of the information regarding Mr. Bennett. After the 18th proffer with his attorney present, there were some questions I needed to ask Mr. Lewis that tentatively would put him as a defendant in this case. So I felt that even though he flew here voluntarily, possibility of him not leaving voluntarily and being arrested was pretty good. So because it would be viewed that he may be in custody, in my custody and not allowed to leave, in a custodial interrogation you have to advise the person that you are talking to of their Miranda rights against self-incrimination and his right to an attorney. So knowing the facts that I knew and the previous statements that had been made, it was my belief that Mr. Lewis was involved and that I needed to Mirandize him before I questioned him.

After the State rested, appellant testified on his own behalf as follows. After he and Mr. Bennett watched a movie about assassins-for-hire, Mr. Bennett set up an online advertisement for "professional and discreet cleaning services." The idea was to gain employment from the ad, get paid, and then leave before actually committing any further crime. Appellant testified that the scheme "was basically a con."

After the ad was posted, Mr. Cooke contacted appellant via email. The initial agreement with Mr. Cooke called for a complete payment of $40,000 with $20,000 to be

8

paid as a deposit. Pursuant to the plan between appellant and Mr. Bennett, Mr. Bennett was to travel to Baltimore, collect the deposit, return to Colorado, and then inform the authorities about Mr. Cooke. Appellant maintained there was never any intent to actually commit murder.

Appellant agreed that he purchased a ticket for Mr. Bennett to go to Baltimore. He also confirmed that Mr. Cooke sent him documentation and information about the victim, Ms. Bernadzikowski. Mr. Bennett then traveled to Baltimore and made contact with Mr. Cooke. Appellant testified that, at some point before the murder, he told Mr. Bennett to come home because the plan was not working. He also stated that Mr. Cooke contacted him before the murder to try and cancel the contract. Nevertheless, Mr. Bennett went ahead with the murder, informing appellant only after he, Mr. Bennett, returned to Colorado. Appellant testified that he did not believe Mr. Bennett would actually complete the crime.[5]

**DISCUSSION**

Appellant contends that the circuit court lacked both subject matter and personal jurisdiction. Recognizing that he did not raise these arguments prior to appeal, he contends they are not subject to waiver. On the merits, appellant contends the State violated the Uniform Act, that his convictions are void and must be vacated, and that he must be

---

[5] The State Judiciary website reveals that, on or around August 20, 2015, Mr. Cooke was convicted by a jury of first degree murder and sentenced to life imprisonment. Circuit Court for Baltimore County Case Number 03K14001589. Mr. Cooke appealed to this Court. That case is pending, Case Number 1470, September Term 2015.

permitted to return to Colorado.  The State responds that appellant's claim concerns a defect in the institution of prosecution, not jurisdiction, and that, by failing to raise the issue before trial, it is waived.  The State also argues that appellant's position fails on the merits, and even if it had merit, he should not be released from custody.

The Court of Appeals has noted the history of the Uniform Act as follows:

...[The] Uniform Act to Secure the Attendance of Witnesses from without a State in Criminal Proceedings ... was promulgated over half a century ago and has been adopted in substance in each state, the District of Columbia, the Virgin Islands, and Puerto Rico.  *See* Uniform Act to Secure Attendance of Witnesses, 11 U. L. A. 1 (1974, 1993 pocket part).  Jurisdictions have adopted variations to the Uniform Act, but the gist and goals of the model law remain intact.  "The essence of the Uniform Act is to create a community of jurisdictions which will honor the request of fellow members for the appearance of witnesses at criminal proceedings under the conditions specified in the Act."  *People v. Superior Court*, 224 Cal.App.3d 1405, 274 Cal.Rptr. 586, 589 (1990).  "The purpose of the Uniform Act ... is to secure at trial the attendance ... of a material witness residing in another state."  *State v. Duncan*, 648 S.W.2d 892, 893 (Mo.App.1983).  *See also State v. Lesco*, 194 Kan. 555, 400 P.2d 695, 699 (1965), *cert. denied*, 382 U.S. 1015, 86 S.Ct. 628, 15 L.Ed.2d 529 (1966) ("The Uniform Act was intended as a matter of comity between states to enable states to obtain material witnesses for criminal prosecutions.").  Long ago, shortly after the Uniform Act was promulgated, it was recognized that "[o]bviously the object of [a uniform statute for the attendance of witnesses enacted by New Jersey] is to promote the enforcement of the criminal laws and the administration of justice in criminal proceedings in the several states."  *People of State of New York v. Parker*, 16 N.J.Misc. 471, 1 A.2d 54, 55 (Cir.Ct.1936).

Maryland's version of the Uniform Act was originally adopted in 1937 and is now codified as § 9-301 through § 9-306 of the Courts and Judicial Proceedings Article (1973, 1989 Repl. Vol.).

*State v. Breeden*, 333 Md. 212, 222-23 (1993).

As further explained by this Court:

> The Uniform Act provides what is essentially a two-stage process for obtaining the compulsory attendance of an out-of-State witness in criminal prosecutions and grand jury investigations.
>
> The first stage originates in the requesting State (Maryland). A person desiring the attendance of an out-of-State witness may approach the appropriate court in his State and, if he is able to convince that court that such be the case, obtain from it a formal certificate under seal that the individual whose presence is sought "is a material witness in a prosecution pending in [the court] or in a grand jury investigation which has commenced or is about to commence...." The certificate, if it is issued, must also specify "the number of days the witness will be required." Md. Code, Courts art. § 9-303(a).
>
> The second stage is to present the certificate "to a judge of a court of record in the county in which the witness is found." *Id.* That judge, upon such presentation, schedules a hearing on the matter. At that hearing, which the witness is directed to attend, the judge considers and determines whether the certificate presented to him has merit – whether the witness is material and necessary to a prosecution or grand jury investigation, whether it would cause any undue hardship on the witness to attend as requested, and whether the witness will be afforded the immunity from arrest and civil process required by the Act. If the judge finds that these statutory prerequisites are satisfied, he "shall issue a summons, with a copy of the certificate attached, directing the witness to attend and testify ... at a time and place specified in the summons." Md. Code, Courts art., § 9-302(b); Va. Code, § 19.2-274.
>
> If, after being tendered the appropriate traveling expenses and witness fee, the witness "fails without good cause to attend and testify as directed in the summons, he shall be punished in the manner provided for the punishment of any witness who disobeys a summons issued from a court of record in this [i.e., the sending ] State." Md. Code, Courts art., § 9-302(d); Va. Code, § 19.2-–276.

*In re Special Investigation No. 219*, 52 Md. App. 17, 22-23, *cert. denied*, 294 Md. 243

(1982); *see also Muhammad v. State*, 177 Md. App. 188, 275 (2007) ("The process for

obtaining the attendance of out-of-state witnesses is spelled out in Maryland Code, Courts

11

and Judicial Proceedings Article, § 9–303(a), the Maryland Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings"), *cert. denied*, 403 Md. 614 (2008).

Section 9-304 of the Uniform Act provides immunity from arrest and service of process, as follows:

> If a person comes into this State in obedience to a summons directing him to attend and testify in this State he shall not while in this State pursuant to such summons be subject to arrest or the service of process, civil or criminal, in connection with matters which arose before his entrance into this State under the summons.

Courts and Jud. Proc. § 9-304 (a); *see also* Courts and Jud. Proc. § 6-305 (a) ("A nonresident person who is within the State for the purpose of testifying in or prosecuting or defending an action may not be served with process").

Generally, the reason witnesses are sometimes granted immunity is explained in the following:

> The general rule that witnesses, suitors, and their attorneys, while in attendance in connection with the conduct of one suit, are immune from service of process in another, is founded, not upon the convenience of the individuals, but of the court itself. As commonly stated and applied, it proceeds upon the ground that the due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation. In *Stewart v. Ramsay*, the court said at page 130, of 242 U.S., 37 S. Ct. 44, 46, quoting from *Parker v. Hotchkiss*, Fed. Cas. No. 10,-739: 'The privilege which is asserted here is the privilege of the court, rather than of the defendant. It is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes

12

interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify.'

*Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) (some citations omitted).

With respect to subject matter jurisdiction:

> Circuit courts of this state . . . derive their jurisdiction from Maryland Constitution, Art. IV, § 20. They are courts of original general jurisdiction, *see Birchead v. State*, 317 Md. 691, 697, 566 A.2d 488, 491 (1989), *First Federated Com. Tr.* [*v. Commissioner*], 272 Md. [329,] 335 [(1974)], authorized to hear all actions and causes, other than those particularly prescribed by statute or constitutional provision for other fora. *Id.* More particularly, pursuant to Maryland Cts. & Jud. Proc. Code Ann. § 1-501 (1973), 1989 Repl. Vol.), they are
>
>> the highest common-law and equity courts of record exercising original jurisdiction within the State. Each has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county, and all the additional powers and jurisdiction conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal.

*Powell v. State*, 324 Md. 441, 446 (1991); *see also In re Nahif A*., 123 Md. App. 193, 212 (1998) ("Without reference to the nature of the jurisdiction of the court involved, a prima facie presumption of jurisdiction arises from the exercise of it. It is presumed that jurisdiction over the subject matter and parties has been rightfully acquired and exercised") (quoting 21 C.J.S. Courts § 74 at 91-92 (1990)), *overruled on other grounds by In re Antoine M*., 394 Md. 491 (2006); 7 Maryland Law Encyclopedia, Courts § 9, p. 19-20 (2013) ("A court of general jurisdiction is presumed to have jurisdiction unless someone

proves that there is some valid constitutional or legislative enactment that has withdrawn jurisdiction in a particular case").

"Lack of subject-matter jurisdiction may be raised at any time." *Harris v. Simmons*, 110 Md. App. 95, 113-14 (1996) (citing *Gardner v. Board of County Comm'rs of St. Mary's County*, 320 Md. 63 (1990)); *see also Sewell v. United States*, 406 F.2d 1289, 1292 (8th Cir. 1969) (observing that lack of subject matter jurisdiction, as opposed to personal jurisdiction, may be raised at any time) (citing *Pon v. United States*, 168 F.2d 373, 374 (1ˢᵗ Cir. 1948)).

The circuit court possessed subject matter jurisdiction. Simply put, Ms. Bernadzikowski's body was found inside her residence in Dundalk, Maryland. *See State v. Butler*, 353 Md. 67, 78 (1999) (recognizing that, for there to be territorial jurisdiction, "the crime, or essential elements of it, must have occurred within the geographic territory of Maryland"); *see also State v. Cain*, 360 Md. 205, 214 (2000) ("It is sometimes stated that each offense has, for jurisdictional purposes, one key act or omission and that this element must have taken place in the state where the prosecution is instituted"). Maryland has a strong interest in prosecuting those responsible for Ms. Bernadzikowski's murder. Appellant has not rebutted the presumption that there was proper subject matter jurisdiction in this case. *See In re John F*., 169 Md. App. 171, 181 (2006) ("[T]he burden is on the party challenging subject matter jurisdiction to rebut that presumption").

Appellant cites *Evans v. Evans*, 75 Md. App. 364, 372-75 (1988), but that case supports our conclusion. In *Evans*, we distinguished between the fundamental jurisdiction

14

of a court to render a judgment and an error of law. The latter is subject to waiver. As the

Court of Appeals recently stated:

> In a much later case where one of the parties asserted that a tribunal's decision, allegedly in violation of a statute, meant that the tribunal lacked subject matter jurisdiction, *Board of License Comm. v. Corridor*, 361 Md. 403, 417-418, 761 A.2d 916, 923 (2000), the Court stated:
>
> > "Simply because a statutory provision directs a court . . . to decide a case in a particular way, if certain circumstances are shown, does not create an issue going to the court's . . . subject matter jurisdiction. There have been numerous cases in this Court involving the situation where a trial court . . . has jurisdiction over the subject matter, but where a statute directs the court . . ., under certain circumstances, to exercise its jurisdiction in a particular way, . . . and the tribunal erroneously refuses to do so because an error of statutory interpretation or an error of fact. In these situations, this Court has regularly held that the matter did not concern the subject matter jurisdiction of the trial court . . . ."

*Tshiwala v. State*, 424 Md. 612, 622 (2012).[6]

Thus, assuming a violation of the Uniform Act, the question is whether the court

should exercise its jurisdiction. If it erred in doing so, it was an error of law and is subject

to waiver. The distinction between lack of jurisdiction and the propriety of exercising it has

long been recognized.

> In explaining the rationale for the mandate we issue in this case, it may be well to recall for the reader that "'[j]uridically, jurisdiction refers to two quite distinct concepts: (i) the power of a court to render a valid [final judgment],

---

[6] Appellant also argues that the issue is somehow akin to a violation of statute of limitations. We note that such claims are an affirmative defense that also must be raised prior to trial. *See Brooks v. State*, 85 Md. App. 355, 363-65 (1991).

and (ii) the propriety of granting the relief sought. 1 Pomeroy, *Equity Jurisprudence* (5th ed. 1941), Secs. 129-31.'" *First Federated Com. Tr. v. Comm'r*, 272 Md. 329, 334, 322 A.2d 539, 543 (1974) (quoting *Moore v. McAllister*, 216 Md. 497, 507, 141 A.2d 176, 182 (1958)). Thus, it is only when a court lacked fundamental jurisdiction to render the judgment it did that there is an absence of authority in the court so as to render its judgment a nullity. *First Federated Com. Tr. v. Comm'r*, *supra*, 272 Md. at 334, 322 A.2d at 543. *Accord*, *Pulley v. State*, 287 Md. 406, 412 A.2d 1244, 1248–51 (1980); *Parks v. State*, 287 Md. 11, 17–19, 410 A.2d 597, 601-02 (1980); *Block v. State*, 286 Md. 266, 270-73, 407 A.2d 320, 322-24 (1979).

*Stewart v. State*, 287 Md. 524, 526-527 (1980). Because appellant failed to raise the issue, the circuit court never addressed the question of whether the statute was violated and, if so, whether it should decline to exercise jurisdiction or invoke some other remedy.

With respect to appellant's arguments relating to personal jurisdiction, appellant was served in the State, and thus, the State acquired personal jurisdiction over him. Again, it is a question of whether it should have been exercised. Regardless, it is settled that "[t]he defense of lack of personal jurisdiction, unlike subject matter jurisdiction, is waived unless raised in a mandatory preliminary motion . . ." *Burnside v. Wong*, 412 Md. 180, 195 (2010) (citations omitted); *see also Casey v. Mayor & City Council of Rockville*, 400 Md. 259, 322-23 (2007) (recognizing that personal jurisdiction may be waived). This is because personal jurisdiction flows from the Due Process Clause, and "recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Further, "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights,

16

be waived." *Id.* at 703.

Appellant argues that, although authorities such as those in the preceding paragraph establish that personal jurisdiction can be waived in civil cases, it cannot be waived in criminal cases. Appellant relies on Md. Rule 8-131 which states, in pertinent part: "The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2-322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court." Appellant argues that the rule refers only to Rule 2-322, a civil rule of procedure, and does not refer to any criminal rules of procedure.

Despite the absence of an express reference to criminal procedure in Rule 8-131, personal jurisdiction may be waived in criminal cases. For example, in *United States v. Rosenberg*, 195 F.2d 583 (2d Cir. 1952), *cert. denied*, 344 U.S. 838 (1952), the prosecution of various individuals for espionage against the United States, Morton Sobell, one of the co-defendants, argued that he was illegally abducted by Mexican police and brought across the border to be tried along with the Rosenbergs on the underlying charges. *Rosenberg*, 195 F.2d at 602. Sobell argued this amounted to kidnapping and deprived the court of personal jurisdiction. *Id.* The Second Circuit declined to consider the question, concluding that the issue, one challenging a defect in the institution of the prosecution, had been waived. *Id.* at 602-03. The Court held that "[p]ersonal jurisdiction can be waived in a criminal as well as a civil case." *Id.* at 603. *See Ford v. United States*, 273 U.S. 593, 606 (1927) ("A plea to the jurisdiction must precede that plea of not guilty. Such a plea was not filed. The effect

17

of the failure to file it was to waive the question of the jurisdiction of the persons of defendants"); *see also United States v. Hill*, 210 F.3d 881, 884 (8th Cir. 2000) (observing that personal jurisdiction in a criminal case may be waived by appearing without objection); *Glynn v. EDO Corp.*, 641 F.Supp.2d 476, 487-88 (D. Md. 2009) (recognizing that the Fourth Circuit has held that personal jurisdiction may be waived) (citing *Bethlehem Steel Corp. v. Devers*, 389 F.2d 44, 46 (4th Cir. 1968)). As explained by another appellate court:

> Jurisdiction over the subject matter, of course, could not be conferred by consent or waiver, but no reason appears why an accused could not subject himself to the court's personal jurisdiction. The procedural safeguards spelling out the method whereby a court obtains jurisdiction over the person of an accused are all designed for his protection. If he elects not to avail himself of the established procedural rights there appears to be none who should be heard to complain.

*People v. Eaton*, 459 N.W.2d 86, 88 (Mich. Ct. App. 1990) (citation omitted), *aff'd*, 479 N.W.2d 639 (Mich. 1992). *See also United States v. Anderson*, 472 F.3d 662, 666 (9th Cir. 2006) ("[T]he means used to bring a criminal defendant before a court do not deprive that court of personal jurisdiction over the defendant") (citing *United States v. Alvarez-Machain*, 504 U.S. 655, 661-62 (1992) (in turn citing and quoting *Ker v. Illinois*, 119 U.S. 436 (1886); *Frisbie v. Collins*, 342 U.S. 519 (1952)).

Not only may personal jurisdiction be waived, but a claim of limited immunity from arrest or service of process may be waived by failure to file timely a proper challenge. *See Zeller v. Cumberland Truck Sales*, 253 S.E.2d 111, 112 (S.C. 1979) ("The exemption or immunity from service of process, afforded under Section 19-9-110, is a personal privilege

18

or exemption and may be waived by the person otherwise entitled thereto") (citations omitted); *see also* 22 C.J.S., *Criminal Procedure and Rights of Accused* § 49 at 327 (2016) ("Since exemption from arrest is merely a personal privilege, it may be waived, and a party who goes to trial without claiming a privilege from arrest by plea or motion waives any such privilege.") (footnotes omitted); *see generally*, *Ex parte Emmett*, 7 P.2d 1096, 1100 (Cal. Ct. App. 1932) (stating, in a case where a state assemblyman claimed exemption from arrest, that "it appears to be very well settled, whether in civil or criminal cases, the exemption being a personal privilege, unless it is claimed by plea or motion, it is waived, and, when one goes to trial upon the plea of not guilty of the offense charged, no question of exemption enters into the cause"); *People v. Rickelman*, 240 N.E.2d 708, 709 (Ill. App. Ct. 1968) (stating, in a case where an attorney claimed a privilege from a charge of speeding while on his way to court, pursuant to a relevant statute, that "[t]he claim of privilege from arrest is waived by the failure of the defendant to insist upon it at the first opportunity").

The Supreme Court has addressed waiver under the federal counterpart to our state rule:

> The waiver provisions of Rule 12(b)(2) are operative only with respect to claims of defects in the institution of criminal proceedings. If its time limits are followed, inquiry into an alleged defect may be concluded and, if necessary, cured before the court, the witnesses, and the parties have gone to the burden and expense of a trial. If defendants were allowed to flout its time limitations, on the other hand, there would be little incentive to comply with its terms when a successful attack might simply result in a new indictment prior to trial. Strong tactical considerations would militate in favor of delaying the raising of the claim in hopes of an acquittal, with the thought that if those hopes did not materialize, the claim could be used to upset an

19

otherwise valid conviction at a time when reprosecution might well be difficult.

*Davis v. United States*, 411 U.S. 233, 241 (1973). *See United States v. Isaac Marquez*, 594 F.3d 855, 858 (11th Cir. 2010), *cert. denied*, 560 U.S. 947 (2010) ("[a] challenge to personal jurisdiction is a claim of defect in instituting the prosecution, and such a challenge is to be raised pursuant to Federal Rule of Criminal Procedure 12."); *see also United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006) ("A motion to dismiss based on lack of personal jurisdiction is one that must be made prior to trial to avoid its waiver"); *United States v. Grote*, 632 F.2d 387, 388-89 (5th Cir. 1980) (holding that a failure to object to personal jurisdiction in a criminal case, based on issuance of a faulty arrest warrant, constitutes a waiver under Fed.R.Crim.P. 12), *cert. denied*, 454 U.S. 819 (1981); 1A Wright & Leipold, *Federal Practice & Procedure: Criminal* 4th § 193, at 180 (2016 Supp.) ("[J]urisdiction over the person . . . is untimely unless filed before the pretrial motions deadline").

Md. Rule 4-252 is similar to the federal rule. *See Kohr v. State*, 40 Md. App. 92, 98 (observing that the predecessor rule to Maryland Rule 4-252 is parallel to Federal Rule of Criminal Procedure 12), *cert. denied*, 283 Md. 735 (1978). Md. Rule 4-252 requires challenges to a defect in the institution of prosecution to be raised in a timely fashion, prior to trial:

> (a) **Mandatory Motions.** In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise:

20

(1) A defect in the institution of the prosecution;

(2) A defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense;

(3) An unlawful search, seizure, interception of wire or oral communication, or pretrial identification;

(4) An unlawfully obtained admission, statement, or confession; and

(5) A request for joint or separate trial of defendants or offenses.

(b) **Time for Filing Mandatory Motions.** A motion under section (a) of this Rule shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4-213(c), except when discovery discloses the basis for a motion, the motion may be filed within five days after the discovery is furnished.

Under this rule, "a motion alleging a 'defect' in the charging document 'other than its failure to show jurisdiction in the court or its failure to charge an offense' must be filed within a designated time period prior to trial or the defect is waived." *Williams v. State*, 302 Md. 787, 792 (1985).

We conclude that an alleged violation of Section 9-304 (a) of the Uniform Act does not result in a lack of subject matter jurisdiction. The alleged violation is an error of law and subject to Md. Rule 4-252. An alleged lack of personal jurisdiction is also subject to the Rule. Appellant did not raise the question in a timely manner, and it is waived.

Appellant's reliance on *Wright v. State*, 500 P.2d 582 (Okla. Crim. App. 1972), and *State ex rel. Forte v. Ferris*, 255 N.W.2d 594 (Wis. 1977), is unavailing. Unlike this case, the issue was properly raised in both of those cases, as the defendants there alleged

21

violations of the Uniform Act, applicable in those states. *See Wright*, 500 P.2d at 586 (observing that the defendant claimed that his rights under the Uniform Act were being violated in the trial court because he was not returned to Texas before being charged in Oklahoma); *State ex rel. Forte v. Ferris*, 255 N.W.2d at 596 (defendant petitioned for a writ of habeas corpus after he had been charged in Wisconsin for first degree murder while he was detained on a summons from Illinois under the Uniform Act).

In sum, we hold that appellant's jurisdictional arguments, based on an alleged violation of the Uniform Act, were not properly preserved for appellate review.

**JUDGMENTS BY THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT**.